Sidney H. Asch, J.
The gulf between the normative assumptions underlying law and human conduct has been wider in cases involving the return of engagement rings than in almost any other area of law. It is easy to program an engagement ring case so that a category selected from the law of contracts or gifts will supply a mechanical solution. But such a computerized result can hardly take into account the cultural realities, the behavioral complexities, or the ethical considerations which are involved.
This action is brought to recover an engagement ring, or, in the alternative, the sum of $2,450, the agreed value of the ring. On or about May 23, 1965, the plaintiff and defendant became engaged to marry. The plaintiff gave the diamond ring in question to the defendant. Plaintiff, and his mother, in addition, gave a gold necklace, a string of pearls and four place settings of sterling silver, to the defendant.
Examination of the record discloses that it was the defendant, herself who broke the engagement, following a dispute with plaintiff’s father regarding the amount of rent which the couple was to spend for living quarters. At that time, plaintiff was a medical student, supported by his parents. Defendant remained adamant in her refusal to go ahead with the marriage, in spite of the attempt by the plaintiff and his mother to effect a reconciliation.
The ring is employed in rites of courtship and marriage in many cultures, primitive and sophisticated; in widely dispersed regions of the earth; persisting through the centuries, in fact millienia. In our culture, the ring generally is placed on one of the fingers, in others, it may be attached to other positions of the anatomy, at intermediate points from the top of the head to the tip of the toes. It is a universal symbol of deep seated sexual and social ramifications, a seminal area of research for behavioral scientists. Is it any wonder that it presents such complicated problems for mere lawyers'?
*312 Before 1935, upon the break-up of a betrothal, the donor, who had not been guilty of premarital wrongdoing, could initiate an action for the return of the engagement ring. In Beck v. Cohen (237 App. Div. 729), the Appellate Division of this Department took the position that the termination of the engagement by the defendant, precluded her from retaining possession of the ring. The court invoked the legal logic that the ring was cloaked with the attribute of a conditional gift, which ripened into permanent ownership upon the act of conjugality. The decision distinguished engagement rings from gifts which were intended to induce the erotic favors, the affectionate responses and the emotional fervor of the female; the other gifts were denominated unconditional (see also, Wilson v. Riggs, 243 App. Div. [1st Dept.], 33, affd. 267 N. Y. 570; Stromberg v. Rubenstein, 19 Misc. 647; Beer v. Hart, 153 Miscc. 277).
In 1935, the Legislature enacted article 2-a of the Civil Practice Act. The article sought to abolish causes of action for, among other things, breach of contract to marry. Prior to that year, such ‘ ‘ breach of promise ’ ’ suits were used by avaricious young women to mulct young men who were both wealthy and rather susceptible to feminine wiles. The Legislature found that such actions had been “subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons, wholly innocent and free of any wrongdoing, who were merely among the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment ”.
Under section 61-h of the Civil Practice Act, (which later became section 80 of the Civil Rights Law in 1962), apparently to obey the legislative direction to construe the statute liberally, the courts held that the statute not only barred the actions for breach of promise to marry against which it was directed, but also actions to recover money, real property, or jewelry delivered in anticipation of a marriage that did not occur (Josephson v. Dry Dock Sav. Inst., 292 N. Y. 666 [1944]; Andie v. Kaplan, 263 App. Div. 884, affd. 288 N. Y. 685; Brandes v. Agnew, 275 App. Div. 843; Morris v. Baird, 269 App. Div. 948).
The New Jersey Court of Errors and Appeals had construed the very similar New Jersey statute to the contrary (Glazer v. Klughaupt, 116 N. J. L. 507) on the same logic as Justices Lazansky and Taylor, dissenting in the Andie case, expressed — to deny recovery supports the unjust enrichment of the defendant.
Instead of suing for breach of promise, a resourceful young woman would simply persuade her swain to shower her with gifts in anticipation of a marriage which she herself would then *313 reject. In trying to remedy an old abuse, the courts seemingly permitted a new one. An analogous arrangement existed among certain Indian tribes, as described by Francis Parkman, in “ The Jesuits in North America in the Seventeenth Century. ” Enterprising Indian maids would enter into connubial agreements with young braves which were to last a day, a week, or more, the ultimate object being matrimony. “ The seal of the compact was merely the acceptance of a gift of wampum made by the suitor to the object of his desire or whim. These gifts were never returned on the dissolution of the connection, and as an attractive and enterprising damsel might, and often did, make twenty such marriages before her final establishment, she thus collected a wealth of wampum with which to adorn herself for the village dances. ”
This state of law was sought to be avoided by judicial legerdemain (Unger v. Hirsch, 180 Misc. 381; Levy v. Gersten, 196 Misc. 255; Easley v. Neal, 202 Misc. 554; Costas v. Marmarellis, 200 Misc. 912; Levine v. Levine, 1 Misc 2d 100) and more directly criticized by learned commentators (see, e.g., Abrahams, “ Return of Engagement Rings in New York, ” N. Y. L. J., Jan. 4, 1963, p. 4; Smith, “Breach of Contract to Marry: New York Civil Practice Act, article 2-A: Recovery of Antenuptual Gifts, 48 Cornell L. O. 186 [1962] ; Reiss, “ The Heart Balm Act and Ante-Nuptial Gifts, ” 13 Brooklyn L. Rev. 174 [1947]; Markewich, “ Take Back your Ring, Sir! ”, N. Y. County Lawyer’s Bar Bull.; March 19, 1949, p. 23; Gribben, “Quasi-Contract: Gifts; Effects of New York Anti-Heart Balm Statute, ” 29 Cornell L. Q. 401 [1944]).
In fact, the Legislature sought to rectify this construction. In 1947, it enacted a proposed section 61-j in 1947, providing that ‘ ‘ This article shall not be deemed to prevent a court in a proper case from granting restitution for property or money transferred in contemplation of the performance of an agreement to marry which is not. performed. ’ ’ But Governor Dewey vetoed the amendment.
Finally, in 1965, section 80-b (L. 1965, ch. 333, § 2) was added to the Civil Rights Law to provide that nothing in the statute shall be construed to bar a right of action to recover property transferred solely in consideration of a contemplated marriage that has not occurred. That section reads as follows:
“ Nothing in this article contained shall be construed to bar a right of action for the recovery of a chattel, the return of money for securities, or the value thereof at the time of such transfer, or the rescission of a deed to real property when the sole consideration for the transfer of the chattel, money or securities or *314 real property was a contemplated marriage which has not occurred, and the court may, if in its discretion justice so requires, (1) award the defendant a lien upon the chattel, securities or real property for monies expended in connection therewith or improvements made thereto, (2) deny judgment for the recovery of the chattel or securities or for rescission of the deed and award money damages in lieu thereof. ’ ’
The language of this section seems to clearly cover the case under consideration. The ‘1 plain meaning ’ ’ of legislative language largely depends upon “the eye of the beholder. ” Legislative history often demonstrates that what is “ plain meaning to the Judge who decides the application of the statute is different from the “ plain meaning ” contemplated by the solons who enacted the law.
Unfortunately, this statute has never been construed authoritatively by the courts of this State. Under existing legislative practices, the debates of the Assembly and Senate are not readily available to assist the court in tracking down the spoor of its intention. Furthermore, the bill jacket, containing the background material of this statute, is under seal and will be unavailable until the incumbent Governor vacates his office (cf. McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 125; American Airlines v. State Comm. for Human Rights, 29 A D 2d 178). So that the court is largely left to its own resources.
Be study of the record herein indicates that the ring was given by the donor in contemplation of marriage and was the sole consideration for the gift. The defendant broke the engagement, herself, and refused to heal the rift in spite of the efforts of the plaintiff and his family. When the burning blue white flames of romance died out, all that was left was the blue white diamond. The defendant does not wish to keep plaintiff’s hand, but she does wish to keep his ring on her finger. In the words of the popular song: “ She took it off her finger, now it doesn’t mean a thing. ’ ’
The new section presumably restores the common-law rules which were in effect prior to the enactment of the anti-heart balm’s statute.
It is this court’s opinion that the ring should be returned, or in the alternative, money damages paid, as per stipulation of value. “Justice so requires.” Trial of this action was held on October 30, 1967, jury having been waived. The original decision was rendered on October 31, 1967. The court, within a few days, advised the attorneys that he wished to reconsider the matter and to look into the legislative history of section 80-b of the Civil Bights Law. On December 4, 1967, the defendant’s *315 attorney wrote to the court consenting to additional time. On the same day, the court set aside the original decision in favor of the defendant and decided in favor of plaintiff.
Defendant has made a formal motion for reconsideration of the decision of December 4, 1967. Motion to reconsider is granted. Upon reconsideration, that decision is adhered to on the grounds set forth above.