No. 77,150

JEROD HEIMAN, *Appellee*, v. HEATHER L. PARRISH, *Appellant*.

(942 P.2d 631)

Opinion filed July 24, 1997.

*Tim J. Moore*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause and was on the briefs for appellant.

*Roger E. McClellan*, of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, C.J.: The issue before us concerns the ownership of an engagement ring after the engagement was terminated.

The case was called for jury trial. After a brief in-chambers conference (no record of which is before us), the court orally decided the issue in open court. What transpired is concisely journalized as follows:

"The parties stipulate to the following facts:
"1. The issue to be determined is the ownership of an engagement ring.
"2. The plaintiff purchased the engagement ring.
"3. The ring was given to defendant as an engagement ring in contemplation of marriage between the parties.
"4. The plaintiff is the party who ended the relationship.
"5. Neither party stipulates to whose fault caused the relationship to terminate.

"Based upon the stipulated facts, the pleadings in the Court file, arguments of counsel and the supporting briefs, the Court finds as a matter of law that since the engagement ring was given in contemplation of marriage, the marriage itself

is a condition precedent to the ultimate ownership of the ring. Since the parties did not perform the condition of marriage, the purchaser is entitled to the return of the ring. The Court further finds that the issue of who ended the relationship is not determinative of the ownership of the ring.

. . . .

"It Is, Therefore Ordered, Adjudged and Decreed that the plaintiff is entitled to the return of the engagement ring and costs are assessed to the defendant."

Defendant appeals therefrom. Additional uncontroverted facts are that the ring was purchased in August 1994 for $9,033. Plaintiff terminated the engagement in October 1995. Defendant refused to return the ring, and this action was filed April 3, 1996. For the sake of simplicity, plaintiff will henceforth be referred as Jerod and defendant will be referred to as Heather.

The case was determined as a matter of law on stipulated facts.

Where the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions, and stipulations, the trial court has no peculiar opportunity to evaluate the credibility of witnesses. In such situation, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below, and to determine de novo what the facts establish. *Kneller v. Federal Land Bank of Wichita*, 247 Kan. 399, 400, 799 P.2d 485 (1990). This court's review of conclusions of law is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

The issues may be summarized as follows. Was the engagement ring a conditional gift given in contemplation of marriage? If this question is answered affirmatively, then, upon termination of the engagement, should ownership of the ring be determined on a fault or no-fault basis? These are issues of first impression in Kansas.

## Conditional Gift

Heather argues that the gift of an engagement ring should be gauged by the same standards as for any other inter vivos gift, and that, once delivery and acceptance have occurred, the gift is irrevocable. She contends Kansas does not recognize conditional gifts.

Jerod argues that an engagement ring is inherently a conditional gift, as it is given in contemplation of marriage. If the wedding does not occur, the ring should be returned to its donor.

To establish a gift inter vivos there must be (a) an intention to make a gift; (b) a delivery by the donor to the donee; and (c) an acceptance by the donee. The gift must be absolute and irrevocable. *Herman v. Goetz*, 204 Kan. 91, 96, 460 P.2d 554 (1969); see *Calvin v. Free*, 66 Kan. 466, 470, 71 Pac. 823 (1903). The elements of intent, delivery, and acceptance are usually questions of fact to be determined by the jury. See *Hudson, Administrator v. Tucker*, 188 Kan. 202, 211, 361 P.2d 878 (1961).

One of the few Kansas cases involving gifts in contemplation of marriage is *Douthitt v. Applegate*, 33 Kan. 395, 6 Pac. 575 (1885). The case was described by the court as follows:

"This was an action brought . . . to set aside a deed of conveyance, and to quiet his title to certain real estate. The deed was executed for the land in controversy by the plaintiff to the defendant on August 14, 1882, and the plaintiff alleges in his petition that it was procured by the defendant through fraud. The facts constituting the alleged fraud are in substance and in brief as follows: The defendant, being a designing and crafty woman, induced the plaintiff, by ardent professions of love and affection, to visit her at her home in Bourbon county. He became very much enamored of her, and visited her frequently. She, designing to defraud him of his property, falsely represented that she was wealthy, falsely professed great love and affection for him, and promised to marry him. She asked him to deed his property to her in order to stop the opposition, as she stated, of her children to their marriage, and promised to deed the land to Fannie C. Shoe, when they were married, and that he should not be poorer for the same, but should be richer. The plaintiff believed that she was sincere in all her professions of love and affection, and in all her promises, and relied upon the same, and he deeded the land to her for no other consideration; but in fact she was not sincere, and never had any intention of marrying him or of performing any of her promises, and afterward refused to marry him and to perform her other promises. He also had much personal property, which he disposed of, and then gave her the proceeds." 33 Kan. at 398.

In affirming the trial court's judgment in favor of the plaintiff, the court stated:

"If the plaintiff was induced to part with his property through the fraud of the defendant, by false promises, elusive hopes, and deluding expectations, held out by her to him, that his condition, financial, social, and otherwise, would be bet-

tered and improved thereby, it makes but little difference whether it was understood by the parties that the property should ever be reconveyed to him, or not. The fraud vitiates the whole transaction, and the parties should be placed back as near to their original condition as possible." 33 Kan. at 400.

The *Douthitt* case turned on the issue of fraud but the opinion implies that a conveyance in contemplation of marriage can be conditional.

*Gerard v. Costin*, 113 Kan. 617, 215 Pac. 1011 (1923), again involved a jilted suitor seeking return of land he had conveyed to the object of his affection. In reversing the trial court's entry of judgment in favor of the plaintiff, the court stated:

"It would be a questionable doctrine to expand the rule of fiduciary relationships so as to declare that when a woman is wooed by an elderly suitor, and receives from him a conveyance of property but rejects his solicitations and offers of marriage, she has the burden of showing she did not take advantage of his age and situation and that the conveyance was voluntary and without constraint and that the donor was of sound mind and knew what he was about." 113 Kan. at 620.

*Gerard* adds little to the resolution of the issue before us, but is included as it is one of the few Kansas cases involving gifts or conveyances by suitors.

*Bowes v. Sly*, 96 Kan. 388, 152 Pac. 17 (1915), is a breach of contract to marry action and does not involve any gifts in contemplation in marriage. It is mentioned only as it was cited by Heather in support of her position and is one of the few Kansas cases arising from a broken engagement.

While there is a paucity of Kansas law on gifts in contemplation of marriage in general, and engagement rings in particular, courts in many other states have wrestled with the issues arising therefrom. Most courts recognize that engagement rings occupy a rather unique niche in our society.

One court characterized the engagement ring as follows:

" 'The ring is employed in rites of courtship and marriage in many cultures, primitive and sophisticated; in widely dispersed regions of the earth; persisting through the centuries, in fact millienia [*sic*]. In our culture, the ring is generally placed on one of the fingers, in others it may be attached to other positions of the anatomy, at intermediate points from the top of the head to the tip of the toes. It is a universal symbol of deep seated sexual and social ramifications, a seminal

area of research for behavioral scientists. Is it any wonder that it presents such complicated problems for mere lawyers?'" (Correction indicator in original.) *Brown v. Thomas*, 127 Wis. 2d 318, 327 n.2, 379 N.W.2d 868 (Ct. App. 1985) (quoting *Goldstein v. Rosenthal*, 56 Misc. 2d 311, 311, 288 N.Y.S.2d 503 [1968]).

By tradition and the mores of our society, an engagement ring is the symbol of the parties' mutual promises to marry. It is unlike any other gift given or exchanged by lovers. The single sentence "She returned his ring" illustrates this. These four words, standing alone, paint the picture of mutual promises to wed, a ring being given and received to symbolize these promises, and the intended bride reneging on her promise and so advising the would-be groom by returning the ring. No like picture is engendered by the phrase "She returned his bracelet." Nothing about the relationship of the parties or the circumstances surrounding the exchange can be implied from these four words.

An extensive discussion of the topic can be found in Annot., Rights in Respect of Engagement and Courtship Presents When Marriage Does Not Ensue, 46 A.L.R.3d 578.

In the absence of a contrary expression of intent, it is logical that engagement rings should be considered, by their very nature, conditional gifts given in contemplation of marriage. Once it is established the ring is an engagement ring, it is a conditional gift.

Other courts have reached a similar conclusion. See *Simonian v. Donoian*, 96 Cal. App. 2d 259, 215 P.2d 119 (1950); *White v. Finch*, 3 Conn. Cir. Ct. 138, 209 A.2d 199 (1964); *Gill v. Shively*, 320 So. 2d 415 (Fla. Dist. App. 1975); *Vann v. Vehrs*, 260 Ill. App. 3d 648, 633 N.E.2d 102 (1994); *Harris v. Davis*, 139 Ill. App. 3d 1046, 487 N.E.2d 1204 (1986); *Fierro v. Hoel*, 465 N.W.2d 669 (Iowa App. 1990); *Aronow v. Silver*, 223 N.J. Super. 344, 538 A.2d 851 (1987); *Mate v. Abrahams*, 62 A.2d 754 (N.J. County Ct. 1948); *Vigil v. Haber*, 119 N.M. 9, 888 P.2d 455 (1994); *Wion v. Henderson*, 24 Ohio App. 3d 207, 494 N.E.2d 133 (1985); *Lyle v. Durham*, 16 Ohio App. 3d 1, 473 N.E. 2d 1216 (1984); *Spinnell v. Quigley*, 56 Wash. App. 799, 785 P.2d 1149 (1990); *Brown v. Thomas*, 127 Wis. 2d 318.

Other types of property may be shown to be conditional gifts given in contemplation of marriage, but such a classification would

require specific evidence of such intent as opposed to just showing the ring was an engagement ring given in contemplation of marriage. As was stated in *Fierro v. Hoel*, 465 N.W.2d at 671, of an engagement ring: "[T]here is no need to establish an express condition that marriage will ensue. A party meets the burden of establishing the conditional nature of the gift by proving by a preponderance of evidence that the gift was given in contemplation of marriage."

In the action herein, the parties stipulated that the object in dispute is an engagement ring given in contemplation of marriage. We conclude the district court correctly held that it was a conditional gift.

### Fault or No Fault

We turn now to who is entitled to the ring under the facts herein. There is a split of authority on this issue. Should ownership be determined on the basis of fault? Or should a no-fault rule be applied and the ring returned to its donor after the engagement is broken, regardless of fault?

The annotation at 46 A.L.R.3d 578, previously cited, extensively summarizes the cases arising in this area and the rationales used to resolve them.

Generally, with regard to who is entitled to the engagement ring once the engagement has been broken, courts have taken two divergent paths. One rule states that when an engagement has been unjustifiably broken by the donor, the donor shall not recover the ring. However, if the engagement is broken by mutual agreement or, unjustifiably by the donee, the ring should be returned to the donor. This is the fault-based line of cases. The other rule, the so-called "modern trend" (46 A.L.R.3d at 584), holds that as an engagement ring is an inherently conditional gift, once the engagement has been broken the ring should be returned to the donor. Thus, the question of who broke the engagement and why, or who was "at fault," is irrelevant. This is the no-fault line of cases.

Heather argues that we should adopt the fault-based rule and award the ring to her, as Jerod ended the engagement. Jerod, for

obvious reasons, urges us to affirm the district court's adoption of the no-fault rule and award the ring to him.

Heather relies in part upon *Simonian v. Donoian*, 96 Cal. App. 2d 259. The *Simonian* case is not persuasive as it turned on a California statute setting forth the parties' rights in gifts given in contemplation of marriage.

Justification for the fault-based rule was picturesquely stated in *Pavlicic v. Vogtsberger*, 390 Pa. 502, 507, 136 A.2d 127 (1957), as follows:

"A gift given by a man to a woman on condition that she embark on the sea of matrimony with him is no different from a gift based on the condition that the donee sail on any other sea. If, after receiving the provisional gift, the donee refuses to leave the harbor,—if the anchor of contractual performance sticks in the sands of irresolution and procrastination—the gift must be restored to the donor."

Presumably, if the donor of the ring was the party refusing to leave the pier, the Pennsylvania court would rule the donee was entitled to the ring.

*Mate v. Abraham*, 62 A.2d at 754-55, applied the fault-based rule, stating:

"On principle, an engagement ring is given, not alone as a symbol of the status of the two persons as engaged, the one to the other, but as a symbol or token of their pledge and agreement to marry. As such pledge or gift, the condition is implied that if both parties abandon the projected marriage, the sole cause of the gift, it should be returned. Similarly, if the woman, who has received the ring in token of her promise, unjustifiably breaks her promise, it should be returned.

"When the converse situation occurs, and the giver of the ring, betokening his promise, violates his word, it would seem that a similar result should follow, i.e., he should lose, not gain, rights to the ring. In addition, had he not broken his promise, the marriage would follow, and the ring would become the wife's absolutely. The man could not then recover the ring. The only difference between that situation, and the facts at bar, is that the man has broken his promise. How, on principle, can the courts aid him, under such circumstances, to regain a ring which he could not regain, had he kept his promise? 'No man should take advantage of his own wrong.' Of course, were the breaking of the engagement to be justifiable, there would be no violation of the agreement legally, and a different result might follow." 62 A.2d at 754-55.

Heather also cites *Spinnell v. Quigley*, 56 Wash. App. 799, as supporting her argument. *Spinnell* considered the same question

as is before us. Relying on 46 A.L.R.3d 578, discussed above, the *Spinnell* court used a contract theory in deciding the case. The court found that an engagement ring is a symbol of an agreement to marry. If that agreement is not performed, then the parties should be restored to their former positions and the ring should be returned. However, if the agreement is not performed because of a breach by the donor, the donor should not benefit from that breach by regaining the ring. In such a case, the ring should be retained by the donee. 56 Wash. App. at 802-03. Specifically, the court held:

> "We agree with the cited authority that the donor of an engagement ring makes the gift upon the implied condition that if the contemplated marriage does not occur, the donee will return the ring. The donee should keep the ring only if the donor *unjustifiably* breaks the engagement." 56 Wash. App. at 802.

We turn now to the no-fault line of cases. In *Vigil v. Haber*, 119 N.M. at 10-11, the court held that the engagement ring was a conditional gift dependent upon the parties' future marriage, that the question of fault in the breaking of the engagement was irrelevant, and that, therefore, once the engagement had been terminated, the ring should be returned to the donor. The *Vigil* court discussed *Spinnell* in reaching this result and declined to follow its rule. The court noted that, although the practice of determining possession of the engagement ring based upon fault is the majority rule, it preferred the modern trend toward no-fault. Likening a broken engagement to a broken marriage, the court noted that no-fault divorce is the modern approach to a broken marriage. Thus, the court believed, a no-fault approach to a broken engagement was equally appropriate. Following the lead of Iowa, New Jersey, New York, and Wisconsin, the court held that when the condition precedent of marriage fails, an engagement gift must be returned. 119 N.M. at 10-11.

The same result was reached in *Aronow v. Silver*, 223 N.J. Super. 344. Although "[t]he majority rule in this country concerning the disposition of engagement rings is a fault rule: the party who unjustifiably breaks the engagement loses the ring" (223 N.J. Super. at 346), the *Aronow* court believed the majority rule to be "sexist and archaic," giving the following explanation:

"The history is traced in 24 A.L.R.2d at 582-586 [superseded by 46 A.L.R.3d 578]. In ancient Rome the rule was fault. When the woman broke the engagement, however, she was required not only to return the ring, but also its value, as a penalty. No penalty attached when the breach was the man's. In England, women were oppressed by the rigidly stratified social order of the day. They worked as servants or, if not of the servant class, were dependent on their relatives. The fact that men were in short supply, marriage above one's station rare and travel difficult abbreviated betrothal prospects for women. Marriages were arranged. Women's lifetime choices were limited to a marriage or a nunnery. Spinsterhood was a centuries-long personal tragedy. Men, because it was a man's world, were much more likely than women to break engagements. When one did, he left behind a woman of tainted reputation and ruined prospects. The law, in a *de minimis* gesture, gave her the engagement ring, as a consolation prize. When the man was jilted, a seldom thing, justice required the ring's return to him. Thus, the rule of life was the rule of law—both saw women as inferiors.

. . . .

"The majority rule, even without its constitutional infirmity, will not stand elementary scrutiny. Its foundation is fault, and fault, in an engagement setting, cannot be ascertained.

"What fact justifies the breaking of an engagement? The absence of a sense of humor? Differing musical tastes? Differing political views? The painfully-learned fact is that marriages are made on earth, not in heaven. They must be approached with intelligent care and should not happen without a decent assurance of success. When either party lacks that assurance, for whatever reason, the engagement should be broken. No justification is needed. Either party may act. Fault, impossible to fix, does not count." 223 N.J. Super. at 348-49.

In *Fierro v. Hoel*, 465 N.W.2d at 671-72, rejecting "an older majority line of cases" which follow the general principle that the donor of the engagement ring can recover the gift only if the engagement is dissolved by agreement or if the engagement is unjustifiably broken by the donee, the court held that "[i]f the wedding is called off, for whatever reason, the gift is not capable of becoming a completed gift and must be returned to the donor."

In *Brown v. Thomas*, 127 Wis. 2d at 328, acknowledging that "most jurisdictions allow recovery of conditional engagement gifts only if the party seeking recovery has not unjustifiably broken off the engagement," the court declined to join them. The court believed that the answer to the question of, Who's at fault, often becomes "lost in the murky depths of contradictory, acrimonious, and largely irrelevant testimony by disappointed couples, their rel-

atives and friends." 127 Wis. 2d at 328. Applying the same public policy it found embodied within Wisconsin's no-fault divorce law, the court held that the only relevant inquiry in conditional engagement gift cases is whether the condition under which the gift was made has failed. 127 Wis. 2d at 329-30; see also *Lyle v. Durham*, 16 Ohio App. 3d 1, (adopting no-fault rule in the absence of an agreement between the parties to the contrary).

After careful consideration, we conclude the no-fault line of cases is persuasive.

What is fault or the unjustifiable calling off of an engagement? By way of illustration, should courts be asked to determine which of the following grounds for breaking an engagement is fault or justified? (1) The parties have nothing in common; (2) one party cannot stand prospective in-laws; (3) a minor child of one of the parties is hostile to and will not accept the other party; (4) an adult child of one of the parties will not accept the other party; (5) the parties' pets do not get along; (6) a party was too hasty in proposing or accepting the proposal; (7) the engagement was a rebound situation which is now regretted; (8) one party has untidy habits that irritate the other; or (9) the parties have religious differences. The list could be endless.

The granting of the divorce decree in Kansas, and the division of marital property, are generally thought to be based on a no-fault determination. However, Kansas law still includes fault as a basis for divorce. See K.S.A. 60-1601(a)(2) (failure to perform a material marital duty or obligation).

In *In re Marriage of Sommers*, 246 Kan. 652, Syl. ¶ 1, 792 P.2d 1005 (1990), it was noted that in domestic relations actions, "fault" is a term of art relating to the only fault ground contained in K.S.A. 60-1601(a)(2) (failure to perform a marital duty or obligation). Although evidence of fault is inadmissible in actions seeking marital dissolution on the ground of incompatibility (K.S.A. 60-1601[a][1]), fault may be considered in a divorce sought under K.S.A. 60-1601(a)(2). 246 Kan. at 654.

As for the division of property in a divorce action, *Sommers* held:

"We conclude that in domestic relations actions it was the legislative intent that, in all but extremely gross and rare situations, financial penalties are not to be

imposed by a trial court on a party on the basis of fault. There is difficulty in establishing rigid rules relative thereto. For purposes of consideration of the financial aspects of the dissolution of a marriage, the term fault must be confined to a term of art relative to a ground for dissolution of the marriage and penalties arising therefrom. Certain conduct might be a fault ground and also be a circumstance properly to be considered in making a determination relative to financial matters. For illustration, let us say that because of the husband's mental abuse of the wife she is so emotionally impaired that her earning capacity is affected. Certainly, the court should consider this in its determination of a fair and equitable award. The court, in such circumstances, is not imposing a penalty for fault but is considering the circumstances of the parties as they exist and making its award based on such existing circumstances and the likely future results arising therefrom." 246 Kan. at 657-58.

The engagement period is one where each party should be free to reexamine his or her commitment to the other and be sure he or she desires the commitment of marriage to the other. If the promise to wed were rashly or improvidently made, public policy would be better served if the engagement promise to wed would be broken rather than the marriage vows.

The ring which was given on the promise of a future marriage and is the symbol of the parties' commitment to each other and their life together is, after the engagement is broken, a symbol of failed promises and hopes, hardly a treasured keepsake for its formerly betrothed wearer. Broken engagements engender hurt pride, anger, and wounded egos. They do not ordinarily present the major questions of changes in lifestyles, standards of living, etc., that broken marriages involve. Yet the legislature has applied the no-fault principle to divorces on the grounds of public policy. It is difficult to see how the public policies involving divorce and the division of marital property are best served by no-fault principles, but broken engagements should require a fault-based determination as to ownership of the engagement ring. Litigating fault for a broken engagement would do little but intensify the hurt feelings and delay the parties' being able to get on with their lives.

We conclude that fault is ordinarily not relevant to the question of who should have ownership and possession of an engagement ring after the engagement is broken. Ordinarily, the ring should be returned to the donor, regardless of fault. As in the *Sommers* case,

we recognize there may be "extremely gross and rare situations" where fault might be appropriately considered. No such rare situation has been suggested to be involved herein.

The district court did not err in awarding the ring to Jerod after concluding fault was irrelevant.

The judgment is affirmed.

ABBOTT, J., not participating.

CHRISTEL E. MARQUARDT, Judge, assigned.[1]

ALLEGRUCCI, J., concurring: I concur in the result reached by the majority. I agree that the no-fault line of cases is persuasive. Fault is not relevant, and the only inquiry should be whether the engagement has been broken. If it has, absent fraud by the donor, the ring must be returned. I would not recognize an exception for "extremely gross and rare situations."

SIX, J., joins the concurring opinion.

MARQUARDT, J., dissenting: I respectfully dissent from the majority's holding.

The courts throughout our country seem to have difficulty in deciding which legal theory applies to ownership of an engagement ring when the engagement is broken. Is the engagement ring a gift or is it used as consideration for the promise to be engaged? If it is a gift, why is it not a completed gift? If it is a conditional gift, what makes it conditional? May a court infer a condition on a gift that was intended to be given and was delivered and accepted? If the ring is consideration for a contract, why not apply breach of contract rules?

"[W]here a transfer of property is made without consideration, the inference is that a gift was intended, not that the grantee was to hold the property for the benefit of the grantor." *Hansen v. Walker*, 175 Kan. 121, 123, 259 P.2d 242 (1953); see *Fooshee v.*

---

[1] **REPORTER'S NOTE:** Judge Marquardt, of the Kansas Court of Appeals, was appointed to hear case No. 77,150 vice Justice Abbott pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c).

*Kasenberg,* 152 Kan. 100, Syl. ¶ 2, 102 P.2d 995 (1940). Where there is an intent to make a gift, the gift is complete when it has been delivered and accepted. *Dubowy v. Baier,* 856 F. Supp. 1491, 1499 (D. Kan. 1994). In applying gift law, Heather's position that the ring is a valid inter vivos gift is supported in that the engagement took place. As far as we know from the limited record, the gift was complete; all the conditions were met. Jerod, without fraud or coercion, intended to make the gift, and the ring was delivered by him and accepted by Heather.

In *Bolen v. Humes,* 94 Ohio App. 1, 7-8, 114 N.E.2d 281 (1951), the court held that when a prospective husband delivers an engagement ring to his prospective wife, it is an irrevocable gift.

" 'In the normal [relationship] of the contracting parties to a future marriage, the man occupies the dominant position, and, in the absence of evidence that this [relationship] has been reversed, a completed gift made by him to his [fiance] cannot be revoked at his option, even though . . . improvidently made . . . .' " 94 Ohio App. at 7 (quoting 24 Am. Jur., Gifts § 51).

See also 38 Am. Jur. 2d, Gifts § 38 (containing similar language). I would apply this rule to engagement rings.

Jerod makes no assertion that he told Heather that if the marriage did not take place, she would have to return the ring. The majority asserts that the condition was inferred and, as such, it was a revocable gift, stating: "In the absence of a contrary expression of intent, it is logical that engagement rings should be considered, by their very nature, conditional gifts given in contemplation of marriage." Those jurisdictions that rely on the analysis that an engagement ring is a conditional gift ignore general gift law, which holds that a gift is complete if there is intent, delivery, and acceptance. *Herman v. Goetz,* 204 Kan. 91, 96, 460 P.2d 554 (1969).

We get into legal contortions when we adopt the majority's view that "an engagement ring is the symbol of the parties' mutual promises to marry." This statement indicates that the majority views the giving of an engagement ring as consideration for a contract. It is difficult to reconcile contract principles with this statement. If the parties have exchanged mutual promises, the consideration for the woman's promise to marry is the man's promise to marry. Under this analysis, the ring is transferred without consid-

eration and is a gift. The majority then disregards the "mutual promise" statement and finds that an engagement ring is a conditional gift in contemplation of marriage.

A conditional gift is one that is conditioned or qualified, and the title does not vest in the donee. See 38 Am. Jur. 2d, Gifts § 81. The majority states: "The engagement period is one where each party should be free to reexamine his or her commitment." Although that may not be the way some people view the engagement period, it has no bearing on the ownership of an engagement ring when an engagement is broken. The majority seems to intertwine the commitment to be engaged with the commitment to be married. The law does not ordinarily become involved with engagements; however, public policy mandates that the law be involved in the breakup of marriages. The commitment to be engaged is given at the time of the engagement, while the commitment to be married is given at the wedding ceremony.

The parties stipulated that the ring was given in contemplation of marriage. This stipulation does not lead to the conclusion that the ring was a conditional gift. Using the majority's analysis, the words "contemplation of marriage" are considered synonymous with "conditioned upon the marriage taking place." I disagree with this legal conclusion as there was no evidence to support such an interpretation here. This case was disposed of by the district court on the stipulated fact that the ring was given in contemplation of marriage. The district court did not consider the issue of intent. If intent was an issue, then the district court should not have disposed of the case on stipulated facts, and a trial should have been held to determine the factual issue of intent.

Applying the "no fault" concept to the ring does not take into account the many expenditures made by the woman in contemplation of marriage. What is the woman to do when she buys a costly dress that cannot be returned? In addition, a bride-to-be may make deposits on a place for the ceremony, a caterer, a reception hall, and entertainment; buy items to be used jointly after the marriage; move from one city to another; etc.—all of which are costly and for the most part, nonrefundable. This court's ruling implies that these expenditures are irrelevant. Although Jerod is

made whole, there is no attempt to put Heather back to her preengagement position, despite the fact that he breached the engagement agreement.

*Douthitt v. Applegate,* 33 Kan. 395, 6 Pac. 575 (1885), involving a gift of land given in contemplation of marriage, turned on the issue of fraud. The *Douthitt* court ordered that the land be returned because of fraud, not because it was a gift in contemplation of marriage. The court made an equitable order so that "the parties [would] be placed back as near to their original condition as possible." 33 Kan. at 400.

Most of the other jurisdictions cited by the majority that have dealt with rings and broken engagements hold that if the engagement is unjustifiably broken by the donor, the donor is not entitled to the return of the ring or other gifts. See, *e.g., Spinnell v. Quigley,* 56 Wash. App. 799, 785 P.2d 1149 (1990). This interpretation incorporates fault grounds while supporting a breach of contract concept.

Why should Jerod be rewarded for having broken the engagement contract? Returning the ring to Jerod rewards him for breaking the engagement. A party who breaches a contract is not usually rewarded for the breach. An engagement ring should not be given special treatment.

In the event of a broken engagement, the engagement ring should be considered a completed inter vivos gift. Regardless, Heather is entitled to keep the engagement ring whether this case is analyzed on the principles of gift law, contract law, or equity.

LOCKETT, J., joins the foregoing dissent.