Gina M. BENASSI, Appellant,

v.

BACK & NECK PAIN CLINIC, INC., Respondent,

Randy S. Miland, individually, Respondent.

No. C9–01–75.

Court of Appeals of Minnesota.

July 10, 2001.

Stephen W. Cooper, Stacey R. Everson, the Cooper Law Firm, Minneapolis, for appellant.

James T. Hynes, James T. Hynes, PLLC, St. Paul, for respondents.

Steven P. Carlson, St. Anthony, for respondent bankruptcy trustee.

Considered and decided by RANDALL, P.J., TOUSSAINT, C.J., and G. BARRY ANDERSON, J.

## OPINION

G. BARRY ANDERSON, Judge.

Appellant Gina Benassi challenges the district court's grant of summary judgment dismissing her sexual harassment

claims under the Minnesota Human Rights Act against respondent Randy Miland and the Back & Neck Pain Clinic, Inc., arguing that the evidence shows respondent engaged in sexual harassment in violation of Minn.Stat. § 363.01, subd. 41 (2000). Appellant also challenges the district court's grant of summary judgment on respondent's counterclaim for the return of an engagement ring. We affirm in part, reverse in part, and remand.

## FACTS

Respondent Randy Miland is a chiropractor and the sole shareholder of the Back & Neck Pain Clinic, Inc., a Minnesota corporation. Appellant Gina Benassi, a long-time patient of respondent, worked at the clinic, first as an intern while in chiropractic school, and then as a licensed chiropractor. Respondent directly supervised appellant during her employment. Respondent and appellant began a romantic relationship, and, in 1990, the parties became engaged to be married. Respondent gave appellant an engagement ring purchased for $24,000.

While working at the clinic, appellant initially received modest pay, but over time appellant's annual salary increased to more than $100,000. According to respondent, appellant's salary had been elevated beyond her market value so that she could independently qualify for a new home loan; the Federal Bureau of Investigation was looking into respondent's business practices which, according to respondent, may have affected his ability to obtain a loan. Appellant qualified for the loan and the parties moved into the new house in 1993.

Appellant alleged that she observed a distinct change in respondent's behavior beginning in 1993: respondent came home late at night under the influence of alcohol "with lipstick on his face and clothes," and a woman named Heidi began calling the clinic asking for respondent several times a day. Appellant claims that respondent broke off the engagement in October 1994.

Despite the failed engagement, the parties continued to share living quarters for nearly two more years. While living together, both appellant and respondent, at different times, attempted to resurrect the romantic relationship. Appellant asserts that respondent instructed clinic staff members to encourage her to give respondent another chance. Appellant refused. The relationship between the parties then soured. Appellant alleges that in November 1995, respondent told appellant that she should "lay down and spread [her] legs and earn [her] money." Appellant claims that when she began to date a patient of the clinic, respondent threatened to terminate her employment, criticized appellant's boyfriend to clinic staff, instructed staff at the clinic to "be mean" to appellant, and disrupted appellant's patient flow by preventing patients from seeing her.

In January 1997, appellant and her boyfriend vacationed in Jamaica. Upon her return, respondent changed appellant's salary structure. Instead of receiving an annual base salary of approximately $100,000, appellant's productivity determined her income level. This change reduced appellant's annual salary by approximately 75%. Appellant contends that, in July 1997, she confronted respondent with proof that (1) new patients were directed away from appellant; (2) referral patients were required to see other staff; and (3) respondent did not allow appellant to see his patients in his absence although she was a senior staff member. According to appellant, as a result of the confrontation, she was placed on suspension. Approximately one month later, respondent terminated appellant's employment.

Respondent alleged that although it was difficult to work with appellant after the

failed relationship, her employment termination was a legitimate business decision. As support, respondent presented evidence showing that for the years 1996 and 1997, respondent maintained an 80.4% and 70% caseload, respectively, while appellant maintained a 12% and 19% caseload, respectively, and that clinic expenses increased substantially between 1993 and 1997 due to salary and contract-labor obligations while the clinic's total sales remained about the same.

Appellant filed suit against respondent and the clinic, alleging marital status discrimination, sex discrimination, and tortious interference with employment contract. Appellant also alleged that respondent aided and abetted the clinic in discriminating against her. Respondent filed a counterclaim for replevin of the engagement ring. The district court heard the parties' motions for summary judgment, granted summary judgment in favor of respondent, and ordered appellant to surrender her engagement ring or its value equivalent after finding it to be a conditional gift made in contemplation of marriage. By appeal dated January 12, 2001, appellant now challenges the district court's grant of summary judgment to respondent on her sexual-harassment claims, and on respondent's replevin claim for the engagement ring.

After this appeal was filed, the district court filed an amended order, which required that appellant pay $24,000 to respondent's bankruptcy trustee instead of tendering the ring to respondent. But upon learning of this appeal, the district court vacated the amended order.

## ISSUES

I. Did the district court err by granting summary judgment in favor of respondent, thereby dismissing appellant's sexual-harassment claims?

II. Did the district court err by granting summary judgment to respondent on his counterclaim for the return of the engagement ring?

## ANALYSIS

On appeal from summary judgment, this court examines whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990); *see* Minn. R. Civ. P. 56.03 (setting forth district court standard for summary judgment). Although appellate courts view the evidence in the light most favorable to the party against whom judgment was granted, summary judgment is appropriate against a party who fails to establish the existence of an element essential to its case. *Lloyd v. In Home Health, Inc.*, 523 N.W.2d 2, 3 (Minn.App.1994). Appellant must show a prima facie case of sexual harassment by proving the "bare essentials of discrimination or harassment, merely sufficient evidence to create the inference of unequal treatment." *Bersie v. Zycad Corp.*, 399 N.W.2d 141, 145 (Minn. App.1987) (citation and quotations omitted).

### I.

Appellant contends the district court erred in granting summary judgment to respondent, thereby dismissing her sexual harassment claim brought under the Minnesota Human Rights Act (MHRA), Minn.Stat. §§ 363.01–.20 (2000). The MHRA provides that it is an unfair employment practice for an employer "because of * * * sex * * * to discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn.Stat. § 363.03, subd. 1(2)(c) (2000). For purposes of sex dis-

crimination, the term "discriminate" includes sexual harassment. Minn.Stat. § 363.01, subd. 14 (2000). Further, "sexual harassment," as defined in the MHRA, includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct of a sexual nature when:

(1) submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining employment * * *;

(2) submission to or rejection of that conduct or communication by an individual is used as a factor in decisions affecting that individual's employment * * *; or

(3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment * * *, or creating an intimidating, hostile, or offensive employment * * * environment; and in the case of employment, the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action.

Minn.Stat. § 363.01, subd. 41 (2000). It is well established that Minnesota courts look to principles and interpretations of federal Title VII cases when construing the MHRA. *Costilla v. State,* 571 N.W.2d 587, 591 (Minn.App.1997), *review denied* (Minn. Jan. 28, 1998).

When analyzing whether a violation of Minn.Stat. § 363.01, subd. 41, occurred, the district court and both parties referred to claims brought under clauses (1) and (2) as "quid pro quo" harassment and those brought under clause (3) as "hostile work environment" harassment. The United States Supreme Court, however, has expressed dissatisfaction with the use of these terms. The Supreme Court stated:

The terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility.

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998). The Supreme Court concluded that sexual-harassment claims must be evaluated in reference to applicable statutory factors—in this case, those set forth in Minn.Stat. § 363.01, subd. 41— and not merely by categorizing claims as quid pro quo or hostile work environment. *Id.*

*A. Minn.Stat. § 363.01, subd. 41(1) and (2)*

▮ Appellant challenges the district court's grant of summary judgment to respondent on her claim under Minn.Stat. § 363.01, subd. 41(1) and (2). A violation under clauses (1) and (2) occurs when a superior forces "an employee to choose between acquiescing to a superior's sexual demands or forfeiting an employment benefit such as promotion, raise, or continued employment * * *." *In re Discipline of Peters,* 428 N.W.2d 375, 378 (Minn.1988).

▮ Minnesota courts use the McDonnell Douglas framework to determine whether a violation of the MHRA has occurred. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 441 (Minn.1983) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The employee has the initial burden of establishing a prima facie case of discrimination. *Id.* at 442. To establish a prima facie violation, a claimant must show:

(1) she is a member of a protected class;
(2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors;
(3) the harassment was based on sex;

and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment.

*Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 473 (8th Cir.1995) (citation omitted); *Grozdanich v. Leisure Hills Health Ctr., Inc.,* 25 F.Supp.2d 953, 966 (D.Minn.1998).

Appellant is a member of a protected class because she is a woman. Minn.Stat. § 363.03, subd. 1(1) (2000). Appellant argues that she met the second element of her prima facie case by testifying that respondent suggested she "lay down and spread [her] legs and earn [her] money." Although the alleged comment is of a sexual nature, it is unclear whether it should be viewed as a sexual advance. The unquestionably offensive and vulgar comment does seem to request sexual favors. Because the comment suggests a sexual act in return for money from the employer, and because we must view the evidence in the light most favorable to appellant's case, we conclude that this evidence satisfies the second element, namely, proof that appellant was subjected to unwelcome sexual harassment in the form of a request for a sexual favor.

But appellant must also show that the submission to the unwelcome attention was an express or implied condition for receiving job benefits, or that her refusal to submit resulted in a tangible job detriment. *Cram,* 49 F.3d at 473. Appellant suggests that her reduction in salary and subsequent employment termination were results of her refusal to revive the relationship with respondent. The record reveals that respondent's alleged comment was made in November 1995, when appellant and respondent were living together. Appellant continued to live with respondent until April 1996, and her salary was not reduced until January 1997. Appellant continued to work for respondent until September 1997. Due to the significant lapse in time between respondent's alleged vulgar and offensive comment and appellant's subsequent salary reduction and termination, we conclude that appellant failed to meet the fourth element of her prima facie case. Therefore, the district court did not err in granting respondent summary judgment on this issue. *See Lloyd,* 523 N.W.2d at 3 (stating summary judgment is appropriate against a party who fails to establish the existence of an element essential to its case).

B. *Minn.Stat. § 363.01, subd. 41(3)*

■ Appellant challenges the district court's grant of summary judgment to respondent on her claim under Minn.Stat. § 363.01, subd. 41(3). The elements of a prima facie violation under clause (3) are: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take timely and appropriate remedial action. Minn.Stat. § 363.01, subd. 41(3); *Costilla,* 571 N.W.2d at 595.

■ As stated above, Minnesota courts use the *McDonnell Douglas* framework to determine whether a violation of the MHRA has occurred. *Hubbard,* 330 N.W.2d at 441. The employee has the initial burden of establishing a prima facie case of discrimination. *Id.* at 442. The burden then shifts to the employer to articulate a legitimate and nondiscriminatory reason for the adverse employment action. *Id.* at 441–42 n. 12. If the employer does so, the burden shifts back to the employee to show that the employer's proffered reason was a pretext for discrimination. *Id.*

Under *McDonnell Douglas,* summary judgment is appropriate if an employee fails to present a prima facie case of employment discrimination. *Albertson v. FMC Corp.,* 437 N.W.2d 113, 116 (Minn. App.1989). Summary judgment is also appropriate if a plaintiff, having established a prima facie case of discrimination, fails to provide evidence that the employer's proffered reasons for its employment decision were a pretext for discrimination. *Id.*

We conclude that appellant met her prima facie burden of proving a violation of Minn.Stat. § 363.01, subd. 41(3). Respondent encouraged staff members to approach appellant and urge her to resume the relationship. When she did not, respondent instructed staff to "be mean" to appellant. When respondent learned of appellant's new boyfriend, he threatened to fire her. Respondent criticized appellant's boyfriend and prevented other patients from seeing appellant. And as discussed above, respondent made an offensive and vulgar comment to appellant.

Under *McDonnell Douglas,* the burden shifts to respondent to show a legitimate nondiscriminatory reason for the termination. *Hubbard,* 330 N.W.2d at 441–42 n. 12. Respondent contended that appellant did not work well with other staff members. Respondent also explained that his business costs increased substantially from 1993 to 1997 while business receipts did not. The evidence showed that during 1996 and 1997 respondent maintained an 80.4% and 70% caseload, respectively, while appellant maintained a 12% and 19% caseload, respectively. To offset rising business costs, respondent based appellant's salary on productivity. We conclude that respondent set forth legitimate nondiscriminatory reasons for reducing appellant's salary and terminating her employment.

Under *McDonnell Douglas,* the burden shifts back to the employee to show that the employer's proffered reasons were pretextual. *Id.* at 441–42 n. 12. The proper scope of inquiry on the issue of pretext is limited to whether the employer gave an honest explanation of its behavior. *Krenik v. County of LeSueur,* 47 F.3d 953, 960 (8th Cir.1995). Appellant must establish that there is a question about whether the employer's justification is pretextual that creates a genuine issue of material fact for trial. *Geraci v. Eckankar,* 526 N.W.2d 391, 396 (Minn.App.1995), *review denied* (Minn. Mar. 14, 1995).

An employee may show pretext

either directly by persuading the court that a discriminatory reason likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986) (citation omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) ("plaintiff may attempt to establish that [she] was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence" (citation and quotation omitted)). Even if an employer has a legitimate reason for the discharge, an employee may nevertheless prevail if an illegitimate reason "more likely than not" motivated the discharge decision. *Anderson v. Hunter, Keith, Marshall & Co.,* 417 N.W.2d 619, 627 (Minn. 1988).

Respondent argues, and the district court concluded, that appellant's termination resulted from legitimate business reasons. Although the evidence suggests that respondent had a legitimate business reason to terminate appellant's employment, appellant has brought forth evidence

alleging that respondent threatened to terminate her employment when learning she was dating someone else, reduced her salary after she returned from vacation with her new boyfriend, criticized her boyfriend to clinic staff, instructed clinic staff to "be mean" to her, and disrupted her patient flow. Using the supreme court's reasoning in *Anderson*, and viewing the evidence in the light most favorable to appellant, we conclude that appellant established a genuine issue of material fact sufficient to defeat summary judgment as to whether an illegitimate reason "more likely than not" motivated respondent's decision to reduce appellant's salary and terminate her employment. *See id.* (holding that employer cannot avoid liability for unlawful discrimination when the discharge from employment is based on an impermissible reason simply because it also offered other reasons that were not pretextual). Accordingly, we reverse the district court and remand this issue for trial.

### C. *Procedural Argument*

 Respondent argues that the sexual-harassment issues raised by appellant are not properly before this court because they were not pleaded in appellant's complaint. We disagree. Appellant alleges sex discrimination in her complaint, and, as stated above, for purposes of sex discrimination, the term "discriminate" includes sexual harassment. Minn.Stat. § 363.01, subd. 14. Both appellant and respondent argued the issues of sexual harassment at the summary judgment hearing, and the district court's order addressed appellant's sexual-harassment claim. We find respondent's argument that the issue of sexual harassment is not properly before this court to be without merit.

 Respondent further alleges that he received appellant's reply motion in opposition to summary judgment on the day of the summary judgment hearing, a violation of Minn. R. Gen. Pract. 115.03 (requiring a party replying to a motion to file its memorandum of law and supplementary documents with the court and serve these documents to opposing counsel as least three days prior to the hearing). The casual and flagrant disregard by appellant's counsel of the rules under which our courts operate is disturbing, to say the least. But it is within the district court's discretion to rule on the motion despite appellant's late filings and, based on the discretion afforded the district court, we will not reverse here because of noncompliance with the rules even though another result is defensible. *See* Minn. R. Gen. Pract. 303.03(b); *Swenson v. Swenson,* 257 Minn. 431, 434, 101 N.W.2d 914, 917 (1960) (stating that where the interests of justice would be best served by relieving a party from formal compliance with a rule, the district court has the discretion to suspend or relax the rules).

### II.

Appellant next argues that the district court erred in granting summary judgment to respondent on his replevin counterclaim for the engagement ring. It is undisputed that appellant and respondent both consider the ring in question to be an engagement ring given in contemplation of marriage.

The issue of returning an engagement ring upon the termination of an engagement is an issue of first impression for Minnesota appellate courts. Other jurisdictions considering the classification of an engagement ring gift have uniformly held that marriage is an implied condition of the transfer of title of the ring and that the gift does not become absolute until the marriage occurs. *See* Annotation, *Rights in Respect of Engagement and Courtship*

*Presents When Marriage Does Not Ensue,* 44 ALR5th 1 § 2 (1996).

The Wisconsin Court of Appeals explained:

> Where a gift of personal property is made with the intent to take effect irrevocably, and is fully executed by unconditional delivery, it is a valid gift inter vivos. Such a gift is absolute and, once made, cannot be revoked. A gift, however, may be conditioned on the performance of some act by the donee, and if the condition is not fulfilled the donor may recover the gift.
>
> We find the conditional gift theory particularly appropriate when the contested property is an engagement ring. The inherent symbolism of this gift * * * forecloses the need to establish an express condition that marriage will ensue. Rather, the condition may be implied in fact or imposed by law in order to prevent unjust enrichment.

*Brown v. Thomas,* 127 Wis.2d 318, 379 N.W.2d 868, 872 (1985) (citations omitted). Similarly, the Ohio Court of Appeals determined that because an engagement ring is a symbol or pledge of a future marriage, it signifies that the one who wears it is engaged to marry the one who gave it to her. *Lyle v. Durham,* 16 Ohio App.3d 1, 473 N.E.2d 1216, 1218 (1984). Therefore, it is given in contemplation of the marriage and is a unique type of conditional gift. *Id.*

Other courts have reached a similar conclusion. *Simonian v. Donoian,* 96 Cal. App.2d 259, 215 P.2d 119, 120–21 (1950); *White v. Finch,* 3 Conn.Cir.Ct. 138, 209 A.2d 199, 201 (1964); *Gill v. Shively,* 320 So.2d 415, 417 (Fla.Ct.App. 4 Dist.1975); *Vann v. Vehrs,* 260 Ill.App.3d 648, 198 Ill.Dec. 640, 633 N.E.2d 102, 106 (1994); *Harris v. Davis,* 139 Ill.App.3d 1046, 94 Ill.Dec. 327, 487 N.E.2d 1204, 1206 (1986); *Fierro v. Hoel,* 465 N.W.2d 669, 671 (Iowa Ct.App.1990); *Heiman v. Parrish,* 262

Kan. 926, 942 P.2d 631, 634–35 (1997); *Meyer v. Mitnick,* 244 Mich.App. 697, 625 N.W.2d 136, 139 (2001); *Aronow v. Silver,* 223 N.J.Super. 344, 538 A.2d 851, 852–53 (Ch.1987); *Mate v. Abrahams,* 62 A.2d 754, 755 (N.J.County Ct.1948); *Gagliardo v. Clemente,* 180 A.D.2d 551, 551, 580 N.Y.S.2d 278 (N.Y.A.D.1992); *Vigil v. Haber,* 119 N.M. 9, 888 P.2d 455, 457 (1994); *McIntire v. Raukhorst,* 65 Ohio App.3d 728, 585 N.E.2d 456, 458 (1989); *Wion v. Henderson,* 24 Ohio App.3d 207, 494 N.E.2d 133, 133–34 (1985); *Lindh v. Surman,* 560 Pa. 1, 742 A.2d 643, 645 (1999); *Spinnell v. Quigley,* 56 Wash.App. 799, 785 P.2d 1149, 1151 (1990).

■ We find the reasoning of other jurisdictions on this issue persuasive and conclude that an engagement ring is a conditional gift given in contemplation of marriage.

■ Having determined an engagement ring is a conditional gift, we must next decide who, in this case, is entitled to the ring. There is a split of authority on this issue. The "majority" approach resolves the issue by determining ownership on the basis of fault. The "minority" approach applies a no-fault rule such that the ring would be returned to the donor after the engagement is broken, regardless of fault. The district court applied the minority approach and ordered appellant to return the ring or its value equivalent to respondent.

Appellant contends the district court erred by adopting a position that is in direct conflict with the majority rule. As support, appellant points to various state courts that have analyzed and accepted the majority, fault-based approach. First, appellant cites reasoning from the New Jersey Supreme Court:

> On principle, an engagement ring is given, not alone as a symbol of the sta-

tus of the two persons as engaged, the one to the other, but as a symbol or token of their pledge and agreement to marry. As such pledge or gift, the condition is implied that if both parties abandon the projected marriage, the sole cause of the gift, it should be returned. Similarly, if the woman, who has received the ring in token of her promise, unjustifiably breaks her promise, it should be returned.

When the converse situation occurs, and the giver of the ring, betokening his promise, violates his word, it would seem that a similar result should follow, i.e., he should lose, not gain, rights to the ring. In addition, had he not broken his promise, the marriage would follow, and the ring would become the wife's absolutely. The man could not then recover the ring. The only difference between that situation, and the facts at bar, is that the man has broken his promise. How, on principle, can the courts aid him, under such circumstances, to regain a ring which he could not regain, had he kept his promise? No man should take advantage of his own wrong. Of course, were the breaking of the engagement to be justifiable, there would be no violation of the agreement legally, and a different result might follow.

*Abrahams,* 62 A.2d at 754–55 (quotation omitted).

Appellant also cites *Spinnell v. Quigley* to support her argument. The *Spinnell* court reasoned:

> We agree with the cited authority that the donor of an engagement ring makes the gift upon the implied condition that if the contemplated marriage does not occur, the donee will return the ring.

The donee should keep the ring only if the donor unjustifiably breaks the engagement.

785 P.2d at 1151. Appellant also asserts that the fault-based reasoning is proper given the inequity in this case. Appellant alleges that respondent's "deeply-disturbing, dangerous and highly insulting behavior" mandates a determination of fault.

Respondent-bankruptcy trustee, on the other hand, argues that the district court properly reflected Minnesota public policy by adopting the no-fault reasoning. The no-fault approach compares a broken engagement to a broken marriage; since a no-fault divorce is the modern approach to a broken marriage, a no-fault approach to a broken engagement is equally appropriate.

Numerous states have abandoned the "majority," fault-based approach in favor of the no-fault approach, including Iowa, Kansas, Michigan, New Jersey, New York, and Wisconsin.[1] The Wisconsin Court of Appeals, explaining why it adopted the no-fault approach, stated:

> [The question of, who is at fault, often becomes] lost in the murky depths of contradictory, acrimonious, and largely irrelevant testimony by disappointed couples, their relatives and friends.

*Brown,* 379 N.W.2d at 873. The *Brown* court, considering Wisconsin's no-fault divorce law, concluded that the only relevant inquiry in conditional engagement gift cases is whether the condition under which the gift was made has failed. *Id.*

Similarly, the Kansas Supreme Court stated:

> The ring which was given on the promise of a future marriage * * * after the

---

1. *See e.g. Fierro,* 465 N.W.2d at 672 (Iowa Ct.App.); *Heiman,* 262 Kan. 926, 942 P.2d at 635–38; *Meyer,* 244 Mich.App. 697, 625 N.W.2d at 139–40; *Aronow,* 223 N.J.Super. 344, 538 A.2d at 853–54 (Ch.); *Gagliardo,* 180 A.D.2d at 551, 580 N.Y.S.2d 278; *Brown,* 127 Wis.2d 318, 379 N.W.2d at 873–74.

engagement is broken, [is] a symbol of failed promises and hopes, hardly a treasured keepsake for its formerly betrothed wearer. Broken engagements engender hurt, pride, anger, and wounded egos. They do not ordinarily present the major questions of changes in lifestyles, standards of living, etc. that broken marriages involve. Yet the legislature has applied the no-fault principle to divorces on the grounds of public policy. * * * Litigating fault for a broken engagement would do little but intensify the hurt feelings and delay the parties' being able to get on with their lives.

*Heiman,* 942 P.2d at 638.

Turning the focus to Minnesota, our review of Minnesota public policy reveals that the Minnesota legislature has applied the no-fault principle to marriage dissolution. *See* Minn.Stat. § 518.06, subd. 1 (2000) (stating that "[a] dissolution of a marriage shall be granted * * * when the court finds that there has been an irretrievable breakdown of the marriage relationship"). The Minnesota legislature has also abolished civil actions for seduction and breach of promises to marry. *See* 1978 Minn. Laws ch. 515 (codified at Minn. Stat. § 553.01–.03 (2000) and abolishing civil causes of action for breach of promise to marry, alienation of affections, criminal conversation, and seduction). The reasoning behind abolishing these civil causes of action is found in Minn.Stat. § 553.01 (2000), which provides:

> Actions based upon alleged alienation of affections, criminal conversation, seduction and breach of contract to marry, have been subject to grave abuses, have caused intimidation and harassment, to innocent persons and have resulted in the perpetration of frauds. It is declared as the public policy of the state that the best interests of the people of

the state will be served by the abolition of these causes of action.

*Id.* We conclude that because the Minnesota legislature has adopted a no-fault marriage dissolution law on the grounds of public policy, and has abolished civil actions based upon alleged alienation of affections, criminal conversation, seduction, and breach of contract to marry as against public policy, it is consistent for this court to adopt a no-fault approach to the return of an engagement ring. The alternative is for the courts to decide what "facts" justify breaking a promise to marry. Are mild differences in political views sufficient? What about vigorous differences in political positions? Do changes in a party's religious or social beliefs constitute sufficient "fault" for ending an engagement? "Fault," for these purposes, is a deceptively elusive concept; because it is impossible to fix with any certainty, it should not be given legal significance.

We conclude that the district court did not err in adopting the no-fault approach to this issue, and, consequently, we conclude that the district court did not err in awarding the engagement ring or its value equivalent to respondent.

## DECISION

The district court did not err in granting summary judgment in favor of respondent on appellant's claims under Minn. Stat § 363.01, subd. 41(1) and (2) (2000), because appellant failed to establish her prima facie case. The district court did err, however, in granting summary judgment on appellant's alleged violation of Minn. Stat. § 363.01, subd. 41(3) (2000), because appellant established that the question of whether an illegitimate reason "more likely than not" motivated respondent's decision to terminate her employment creates a material fact issue for trial. The district court did not err in granting summary

judgment on respondent's replevin counterclaim for the engagement ring.

**Affirmed in part, reversed in part, and remanded.**