**In re Barbara D.W. HECK, Debtor.**

No. 03–21569–13.

United States Bankruptcy Court, D. Kansas.

Oct. 24, 2006.

Cynthia F. Grimes, Grimes and Rebein, L.C., Lenexa, KS, for Debtor.

---

**OPINION DETERMINING: (1) ENGAGEMENT RING IS NOT PROPERTY OF THE ESTATE, (2) DEBTOR DOES NOT HAVE SUFFICIENT REGULAR INCOME TO BE ELIGIBLE FOR CHAPTER 13 OR TO PROPOSE A FEASIBLE PLAN, AND (3) THE CASE MUST BE RE-CONVERTED TO CHAPTER 7**

DALE L SOMERS, Bankruptcy Judge.

This matter is before the Court for decision following an evidentiary hearing on July 27, 2006. The issues at that hearing were (1) whether an engagement ring is property of the Debtor's bankruptcy estate; (2) if the ring is property of the estate, what is its value; (3) whether the Debtor's Chapter 13 plan can be confirmed; and (4) whether the case should be converted to Chapter 7. The Debtor appeared on her own behalf. Creditor U.S. Bank National Association appeared by counsel Mark A. Shaiken. Interested party Terry Sutcliffe appeared by counsel Scott B. Haines. Dianna Lord appeared on behalf of Chapter 13 Trustee William H. Griffin. The Court heard the evidence and arguments presented by the parties, and is now ready to rule.

When Barbara D.W. Heck of Lawrence, Kansas, filed a Chapter 7 bankruptcy petition in April 2003, she was engaged to Terry Sutcliffe, who had given her a valuable diamond engagement ring that she listed in her bankruptcy schedules as a conditional gift. After being asked about Sutcliffe at the meeting of her creditors, she broke off the engagement and returned the ring to Sutcliffe. In March 2005, the Court entered a judgment excepting the Debtor's debt to U.S. Bank (also of Lawrence, Kansas) from her discharge, pursuant to 11 U.S.C.A. § 523(a)(6). The Debtor then converted the case to Chapter 13. The Court denied confirmation of plans she filed proposing to pay $100 per month and $200 per month for 60 months. U.S. Bank filed a motion to re-convert the case to Chapter 7. The Debtor has again amended her plan, this time proposing to pay $400 per month for the remainder of the 60 months since she made her first plan payment. Soon after she did that, Sutcliffe filed a motion for a determination whether the engagement ring is property of the Debtor's bankruptcy estate. After considering all the circumstances, the Court concludes (1) the engagement ring is not property of the Debtor's bankruptcy estate, and its value is therefore irrelevant to this case, and (2) the Debtor's plan cannot be confirmed because she does not have sufficient regular income to qualify to be a Chapter 13 debtor or to fund a feasible plan. In addition, cause exists under § 1307(c) for the case to be converted or dismissed. Although the main reason the Bank wanted the case to be re-converted was so the Chapter 7 trustee could liquidate the ring, which will not happen since the Court is concluding the ring is not property of the estate, the estate does have money the Chapter 7 trustee collected before the case was con-

verted to Chapter 13 that must be distributed to creditors. Consequently, the Bank's motion to convert will be granted.

## FACTS

Before she filed for bankruptcy, the Debtor owned a corporation through which she ran an interior design and home furnishings retail store. The Bank (and some predecessors) provided financing for the corporation, secured by its inventory and the Debtor's personal guarantee, which in turn was secured by a second mortgage on her home. When the corporation ran into financial trouble, the Debtor used the proceeds of the inventory to pay suppliers, rather than the Bank. During the spring of 2003, the Debtor sold off all the inventory and closed the corporation's store. She did, however, continue to perform interior design work from her home as a sole proprietor.

By 2003, the Debtor was engaged to Terry Sutcliffe, who had given her an expensive diamond engagement ring. They planned to get married on July 4 of that year. Because of the debts her business had incurred and the reduction in income she suffered when she closed it, the Debtor filed a Chapter 7 bankruptcy petition in April 2003. She reported on her bankruptcy schedules that she had a conditional gift interest of unknown value in the engagement ring, and claimed the interest as exempt to the extent of the $1,000 jewelry exemption allowed by K.S.A. 60–2304(b). She also reported that she had diamond earrings worth $500 and a diamond bracelet worth $100.

The first meeting of creditors in the Debtor's bankruptcy case was held on May 29, 2003. On the way to the meeting, the Debtor mailed invitations for a small wedding and reception she and Sutcliffe planned to hold at the Arizona Biltmore Hotel. She wore the engagement ring to the meeting of creditors, and the Chapter 7 trustee and the Bank's attorney both asked her about it.

Because the Debtor felt that the bankruptcy case was her problem and that the Bank's attorney was showing more interest in Sutcliffe than in her, soon after the creditors' meeting, she broke off the engagement and gave the ring back to Sutcliffe.[1] She testified that the bankruptcy case was her problem and she wanted to get it resolved before again considering marriage. She did not want Sutcliffe to be caught up in her bankruptcy. Nevertheless, in May 2003, she moved out of her house and into the house where Sutcliffe lives, and has continued to live with him since then. They also went ahead and had the party at the Arizona Biltmore Hotel on July 4, essentially as planned but without the wedding ceremony. The Court finds the Debtor's explanation of her reason for breaking off the engagement to be credible, and specifically rejects the Bank's assertion she really ended the engagement so her creditors could not recover the ring. While the Debtor was mistaken about the extent to which Sutcliffe could be brought into her bankruptcy case if they married, she nonetheless called off the marriage because she believed it would drag him into the case. Sometime after the Debtor moved, the Bank apparently foreclosed on her home.

The Bank filed a dischargeability complaint, seeking to have the Debtor's debt to it excepted from her discharge. A trial was held, and the Court entered a judgment in March 2005 declaring the debt

---

1. Testimony at the various hearings in this case lead the Court to believe there was significant animosity and distrust between the Bank and Sutcliffe. He had been a high-level officer of the Bank for a long time before it was acquired by the present owners. When Sutcliffe later failed to receive an anticipated promotion, he left the Bank and became the president of a competing bank also located in Lawrence, Kansas.

was covered by § 523(a)(6) and was therefore nondischargeable. A discharge of the Debtor's other debts had been entered in February 2004.

In the meantime, the Chapter 7 trustee recovered about $3,000, mainly from a settlement of a preference action, and had just under $2,000 left after paying administrative expenses. Creditors were notified that July 6, 2004, was the general deadline for filing proofs of claim, and that October 4, 2004, was the deadline for governmental creditors to do so. Twelve general claims were filed by the first deadline, and no governmental claims were filed by the second deadline.

As indicated, after the Debtor closed the corporation's business, she continued to do interior design work, including some for people who had been the corporation's customers. On the schedules she filed in April 2003 with her bankruptcy petition, she reported monthly income from the operation of a business of $3,000 per month, although she noted that the income was projected; she reported monthly expenses of $3,196.04. In April 2005, the Debtor filed amended schedules reporting that she made $100 per month from the operation of a business and had monthly expenses of about $1,200 that she paid; she indicated Sutcliffe was paying for her housing, food, and utilities. In August 2005, she amended her schedules again, reporting that her business income was about $1,400 per month, and the monthly expenses she paid were about $1,300; she again indicated Sutcliffe was paying for her housing, food, and utilities. She indicated her income was a projection based on her amended 2004 tax return. Monthly income of $1,400 would mean she made only $16,800 in 2004, well below the $36,000 per year she had projected when she filed for bankruptcy. Until at least August 2006, her interior design business was the only job she had after closing the corporation's retail store.

In April 2005, shortly after the Court declared her debt to the Bank to be nondischargeable, the Debtor converted her case to Chapter 13. She filed a plan proposing to pay $100 per month for 60 months, to which the Bank objected. At a hearing in September 2005, the Court denied confirmation of the plan, and gave the Debtor time to file an amended plan. The Court also suggested the Debtor appeared to be capable of obtaining employment making more money than her interior design work was producing, which would allow her to pay more into her plan. A couple of weeks after that hearing, the Bank filed a motion to convert the case back to Chapter 7. A few days after that, the Debtor amended her plan to propose paying $200 per month, beginning with the next monthly payment, for the remainder of 60 months. In addition, she proposed to cash in an exempt IRA, pay the tax penalty for doing so, and pay the balance into the plan. She also said she would increase her plan payments to the extent necessary, based on the Court's determination of the value of her interest in the engagement ring, so that her unsecured creditors would receive at least as much under her plan as they would in a Chapter 7 liquidation. The Bank objected to this plan as well. At a hearing in January 2006, the Court denied confirmation, and gave the Debtor time to amend her plan again. The Debtor has amended her plan as allowed, now proposing to pay $400 per month for the remainder of 60 months. The Bank objected to this plan as well. The Bank's motion to convert has remained pending, and the question of the value of the bankruptcy estate's interest in the engagement ring has also remained unresolved.

Late in May 2006, Sutcliffe's attorney entered an appearance in the case and filed a motion for a determination whether the engagement ring is property of the Debtor's bankruptcy estate. On July 27, the Court held an evidentiary hearing on

that question, along with the questions whether the Debtor's latest plan could be confirmed and whether the case should be converted back to Chapter 7. The Debtor testified at this hearing, as she had several times before, that she did not call off her wedding with Sutcliffe in order to keep her creditors from getting the engagement ring, but because the bankruptcy case is her problem and she wants to get it resolved before she marries him. She said she might never marry him now. No evidence was presented indicating that Sutcliffe has made any enforceable promise to continue to pay most of the Debtor's living expenses while she pays much of her income into a Chapter 13 plan. The Debtor testified that although her only job since April 2003 has been self-employment doing interior design work, she also has a certificate to substitute teach and, about ten days after the hearing, would be interviewing for a job substitute teaching for the Lawrence public schools. This job possibility developed only a few days before the July 2006 trial of this matter. The Debtor hoped she would be able to work as a substitute at least one day a week, but had no clear idea whether more work than that might be available.

## DISCUSSION

*1. The Engagement Ring Itself Is Not Property of the Bankruptcy Estate, and the Estate's Conditional Interest in the Ring Was Probably Worth Nothing on the Day the Debtor Filed for Bankruptcy, But Was Certainly Worth Less than $1,000.*

As might be expected, the Bank contends that the engagement ring became property of the bankruptcy estate when the Debtor filed her Chapter 7 petition and that she had no authority to give the ring back to Sutcliffe. The Debtor and Sutcliffe argue the ring was a conditional gift that reverted to Sutcliffe when the Debtor broke off the engagement. If the ring is property of the estate, the Debtor's Chapter 13 plan will have to pay her unsecured creditors at least as much as the value of the ring, minus the $1,000 portion of its value that the Debtor can exempt under Kansas law. Because the credible and unchallenged evidence indicated the ring is worth at least $90,000, if the Court were to conclude the ring is property of the estate, the Debtor would have to propose a substantial increase in payments for her plan to satisfy the requirement that it pay her unsecured creditors at least as much as they would receive in a Chapter 7 liquidation of her bankruptcy estate.[2]

The Bankruptcy Code generally provides that when a debtor files for bankruptcy, the debtor's legal and equitable interests in property become property of the estate.[3] But nonbankruptcy law, usually state law, defines the debtor's rights in the property.[4] In the absence of explicit federal preemption, a Chapter 7 trustee ordinarily receives the property subject to any restrictions nonbankruptcy

---

**2.** *See* § 1325(a)(4). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat 23 (enacted April 20, 2005), was passed and took effect well after this case was filed, and the parties have not suggested that any of its provisions that apply to pending cases are involved in this case. Consequently, the citations in this opinion are to the Bankruptcy Code as it existed before the BAPCPA amended it.

**3.** 11 U.S.C.A. § 541(a).

**4.** *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

law imposed on the debtor's rights.[5] "An interest limited in the hands of the debtor is equally limited in the hands of the estate."[6] The issue before the Court therefore requires determining the Debtor's interest in the engagement ring under Kansas law on the date of filing.

The parties agree *Heiman v. Parrish*[7] declares that the ring was a conditional gift under Kansas law, and gives at least some guidance on the question now before the Court. *Heiman* involved a broken engagement. A man bought a ring (for about $9,000) and gave it to his girlfriend when they got engaged. About fourteen months later, he ended the relationship. When she refused to return the ring, he sued to recover it. The couple stipulated to these facts but did not agree whose fault caused the relationship to end, and asked the trial court to decide, based on their stipulations, who owned the ring. The trial court ruled that marriage was a condition precedent to the ultimate ownership of the ring, and since the condition did not occur, the man was entitled to the return of the ring.

On appeal, the Kansas Supreme Court affirmed. The court said an engagement ring is unique in our society and, in the absence of a contrary expression of intent, should be considered a conditional gift given in contemplation of marriage, rejecting the woman's argument that Kansas law does not recognize conditional gifts.[8] The court then turned to the question whether fault has any impact on who gets the ring when the engagement is broken.[9] The court noted that some courts had adopted a rule that the party who gave the ring, the donor, cannot recover it if he unjustifiably broke the engagement, while others had adopted a no-fault rule, always returning the ring to the donor. Pointing out that Kansas has adopted a general no-fault rule for granting divorces and dividing marital property, five justices concluded the no-fault rule should at least ordinarily apply to broken engagements.[10] Three of those five believed that fault could be considered in "extremely gross and rare situations," because fault can still be considered when a divorce is sought, under K.S.A. 60–1601(a)(2), on the ground of failure to perform a marital duty or obligation, but stated that no such situation had been suggested to exist in the case before them.[11] Two of the five concurred in the result, saying fault should never be relevant, although fraud by the donor could be.[12] A judge who was sitting by appointment in place of one of the

**5.** *Integrated Solutions, Inc., v. Service Support Specialties, Inc.*, 124 F.3d 487, 492–93 (3d Cir.1997); *see also In re ANR Advance Transportation Company, Inc.*, 247 B.R. 771, 774 (Bankr.E.D.Wis.2000) (finding escrow to be valid and holding none of escrow funds were property of estate); *Dickerson v. Central Florida Radiation Oncology Group*, 225 B.R. 241 (M.D.Fla.1998) (holding funds debtor was required to deposit in segregated account were held in escrow and debtor's interest was limited to contingent remainder, which became property of estate on bankruptcy filing); *Cedar Rapids Meats, Inc. v. Hagar (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562 (Bankr. N.D.Iowa 1990) (holding fund established to guarantee payment of worker's compensation claims was an escrow and not property of estate; debtor's interest was limited to contingency).

**6.** *In re ANR Advance Transportation Co., Inc.*, 247 B.R. at 774 (quoting *In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir.1985)).

**7.** 262 Kan. 926, 942 P.2d 631 (1997).

**8.** *Id.* at 927–31, 942 P.2d 631.

**9.** *Id.* at 931–37, 942 P.2d 631.

**10.** *Id.* at 935, 942 P.2d 631.

**11.** *Id.* at 936–37, 942 P.2d 631.

**12.** *Id.* at 937, 942 P.2d 631.

regular members of the court dissented in favor of a fault-based rule, and the sixth regular member sitting on the case joined her dissent.[13]

■ For the case before this Court, then, *Heiman* clearly establishes that the engagement ring was a conditional gift, and that under the general rule, Sutcliffe became entitled to recover it when the Debtor broke off their engagement. The Bank has not suggested that this case involves one of the "extremely gross and rare situations" when fault might change that result, or that Sutcliffe committed any kind of fraud that might justify a different result. Instead, the Bank contends the fact the Debtor filed a bankruptcy case before she called off the marriage terminated her power to return the ring to Sutcliffe.

The Bank has cited only one bankruptcy decision that involved the question whether an engagement ring became property of the estate when the recipient of the ring filed a Chapter 7 bankruptcy petition, *Cates–Harman v. Stage (In re Stage).*[14] Although that court did hold that the ring was property of the estate, by the time the court addressed the question, the debtor had gone through with the marriage, thus fulfilling the condition that might have revoked the gift.[15] The case before this Court, of course, requires answering the more difficult question whether the Debtor still had the right to revoke the gift after she filed for bankruptcy. *Stage* does not help the Court with that question.

The Bank also cites three cases that involved debtors' postpetition efforts to re-nounce or reject bequests or other gifts. In *Flanigan v. Lewis (In re Lewis),*[16] the debtor renounced a bequest postpetition, but the court ruled the bequest had to be turned over to the bankruptcy estate. In *Remes v. Robison (In re Houten),*[17] a gift of a remainder interest in real property had been made prepetition but the debtor did not learn of it until after he filed for bankruptcy; the court said on the filing of bankruptcy petition, the right to accept or reject the gift passed to bankruptcy estate and the debtor no longer had any right to reject it. In *Williams v. Chenoweth (In re Chenoweth),*[18] the court ruled the debtor became entitled to acquire property under a will when the testator died, not when the will was later admitted to probate, and under § 549 of the Bankruptcy Code, the trustee could avoid as an unauthorized postpetition transfer the debtor's attempted disclaimer of her rights under the will. These cases are similar to the one before this Court in that the debtors took action after filing for bankruptcy that they hoped would deprive their estates of property. But the debtors in those cases had to do nothing but passively accept the gifts in order for the property to come into their estates. The Debtor before this Court, however, had to do something much more significant than merely passively accept Sutcliffe's gift for her bankruptcy estate to become the owner of the ring: she had to marry Sutcliffe. These cases provide little support for concluding the Bankruptcy Code somehow obliged the Debtor to fulfill the condition on Sutcliffe's gift to her.

In a supplemental brief, the Bank cites *In re Estate of Lowe,*[19] a case where a

---

13. *Id.* at 937–40, 942 P.2d 631.

14. 85 B.R. 880 (Bankr.M.D.Fla.1988).

15. *See id.* at 881.

16. 45 B.R. 27, 29–30 (Bankr.W.D.Mo.1984).

17. 56 B.R. 891, 897 (Bankr.W.D.Mich.1986).

18. 132 B.R. 161, 163–66 (Bankr.S.D.Ill.1991).

19. 146 Mich.App. 325, 379 N.W.2d 485 (1985).

couples' engagement ended because the woman died, after which the man sued to recover an engagement ring from her probate estate. The Michigan Court of Appeals agreed that the ring was a conditional gift, but ruled the man could not recover it.[20] The Bank suggests the case stands for the proposition that the donor's rights in an engagement ring can be cut off by the intervention of third parties such as probate estates and trustees. The Court cannot agree. As this Court reads the opinion, the Michigan court based its ruling on the fact the woman never broke the agreement to get married and never refused to get married, not on the fact any third parties' rights had intervened to supersede the man's rights in the ring. Although the court said the typical fault-based rule did not help resolve the case before it, it quoted and heavily relied on a case, *Urbanus v. Burns*, that clearly did apply a fault-based rule to the question whether a man could recover jewelry he had given in contemplation of marriage to a woman who later died.[21] In *Urbanus*, the court said all the cases it had examined that held the woman had to return such jewelry were cases where the woman refused to carry out the contract to marry.[22] The court said:

> At the time the articles of jewelry were presented, both parties knew that according to the course of nature, either one of them might die before the marriage was consummated. Had [the woman] lived and had [the man] declined to marry her, he could not recover the jewelry or the value thereof. Had he died before they became married, his

personal representatives could not recover the jewelry for the benefit of his estate. At the time of her death, [the woman] had a right to the possession of the jewelry as against all persons. She did not at any time break the contract to marry [the man] or refuse to marry him. She was the owner of the jewelry at the time of her death and she did not breach the marriage troth. Hence, [the man] had no right to claim the recovery of the same as against her brother and sisters or personal representative.[23]

The last four sentences of this discussion were quoted by the *Lowe* court.[24] This more complete quotation leads the Court to conclude both the *Lowe* court and the *Urbanus* court were applying a fault-based rule to the question of the ownership of gifts given in contemplation of marriage, a rule the Kansas Supreme Court rejected in *Heiman*. Instead, *Heiman* suggests a rule that returns the ring to donor whenever the marriage condition is not fulfilled.

The Bank's assertion that the intervention of third parties' rights could change the result of a dispute over the ownership of an engagement ring after the engagement has been called off has led the Court to consider the implications of another Kansas decision, *In re Marriage of Smith*.[25] In that case, after a married couple filed for divorce, the husband's former employer obtained a judgment against him for fraud, embezzlement, and conversion, and intervened in the divorce action.[26] The employer failed to prove that the wife participated in the husband's misdeeds or that any of the property involved in the divorce was the proceeds of the mis-

---

**20.** *Id.* at 486–87.

**21.** 300 Ill.App. 207, 20 N.E.2d 869 (1939).

**22.** *Id.* at 871.

**23.** *Id.* at 871.

**24.** 379 N.W.2d at 487.

**25.** 241 Kan. 249, 737 P.2d 469 (1987).

**26.** *Id.* at 249–50, 737 P.2d 469.

deeds.[27] The Kansas Supreme Court ruled (1) the divorce petition created a species of common or co-ownership and a vested interest in one spouse in all the property individually or jointly owned by the other, and (2) until the divorce court divides the property, the property is not subject to a lien or execution based on a judgment obtained against one spouse during the pendency of the divorce action.[28] The fact the *Heiman* court looked to Kansas divorce law in reaching its decision indicates the court would also look to the divorce law established in *Smith* in order to decide the question now before this Court. *Smith*, in turn, suggests that while the Debtor's engagement to Sutcliffe was pending, the Debtor's creditors could obtain no interest in the engagement ring that would defeat the Debtor's power to revoke Sutcliffe's conditional gift by terminating the engagement and returning the ring to him.

■ For its final argument in favor of concluding the engagement ring is property of the Debtor's bankruptcy estate, the Bank contends that even if Kansas law indicates the ring is not property of the estate, federal interests or Congressional commands could support a decision to reject that state law as the rule of decision in this case, citing the decisions of the bankruptcy court and the district court in *In re KAR Development Associates, L.P.*[29] The bankruptcy purposes the Bank identifies are (1) the distribution of property for the benefit of creditors of the bankruptcy estate, and (2) the reasonable inferences to be drawn from the evidence that (a) the Debtor called off the wedding only to keep the ring's value away from her creditors, and (b) the Debtor and Sutcliffe will get married as soon as a low-paying plan is confirmed. The Court can quickly reject the second asserted purpose because, as indicated earlier, despite the Court's reservations about the Debtor's credibility on other points, the Court is convinced that the Debtor called off the wedding because, fearing (whether or not her fear was justified) that an immediate marriage would drag Sutcliffe into her bankruptcy case, she believed the case was a personal problem that she should resolve before she married Sutcliffe, and not because she wanted to keep her creditors from recovering the engagement ring. Certainly no direct evidence to the contrary was presented.

If the first purpose the Bank identifies were sufficient to override state law limitations on the extent of a debtor's "legal or equitable interests" in property,[30] then there would seem to be little or no reason ever to recognize such limitations in bankruptcy. The *KAR Development* opinions do not support such a broad negation of state law. In that case, the courts were considering whether a transaction that had the economic substance of a secured transaction but was declared by state law to be a true or bona fide lease had to be treated as an "unexpired lease" under § 365 of the Bankruptcy Code based on the state law designation of the transaction, or could be treated as a secured transaction by applying a federal common law definition of the words "unexpired lease" in § 365.[31]

While the Court agrees there is a general bankruptcy policy of distributing prop-

---

27. *Id.* at 254–55, 737 P.2d 469.

28. *Id.* at 256, 737 P.2d 469.

29. 180 B.R. 597 (Bankr.D.Kan.1994) (Flannagan, J.), *aff'd* 180 B.R. 629 (D.Kan.1995) (Van Bebber, J.).

30. *See* § 541(a)(1).

31. *See* 180 B.R. at 612–18 (Flannagan, J.) and 180 B.R. at 633–39 (Van Bebber, J.).

erty for the benefit of debtors' creditors, the Bank has not linked that policy to any language in the Bankruptcy Code that might be defined in this case by federal common law rather than state law. Furthermore, the Bankruptcy Code clearly establishes exceptions to the general policy of distributing property to creditors. For example, § 541(c)(2) provides that a restriction on the transfer of a debtor's beneficial interest in a trust that is enforceable under applicable nonbankruptcy law is enforceable in bankruptcy. In addition, § 522(b) authorizes debtors to exempt property from property of the estate, under either state law or federal law. These provisions explicitly demonstrate that state law is at least sometimes allowed to overcome the general bankruptcy policy of distributing property for the benefit of creditors.

The Court also believes that while an agreement to marry might not be considered to be an executory contract, it is at least analogous to one, which leads the Court to consider § 365(c)(1)(A) of the Bankruptcy Code. That provision says that a trustee may not assume or assign a debtor's executory contract if applicable law would excuse a party to the contract (other than the debtor) from accepting performance from or rendering performance to an entity other than the debtor, and that party does not consent to the trustee's assumption or assignment of the contract. Obviously, a trustee could not fulfill the marriage condition on Sutcliffe's gift without Sutcliffe's consent, even assuming the unlikely circumstance that the trustee would want to marry him. To the extent an engagement might be considered an executory contract, then, this provision would preclude a trustee from bringing the ring into the bankruptcy estate. Because the provision does not go on to authorize a bankruptcy court to require a debtor to perform a contract so that the bankruptcy estate can receive the contract's benefits, the provision also implies the Court has no power to order the Debtor to fulfill the condition on Sutcliffe's gift so that her bankruptcy estate might become the owner of the ring.

■ Based on all these considerations, the Court concludes the engagement ring is not property of the bankruptcy estate, but belongs to Sutcliffe since the Debtor has broken off their engagement. Furthermore, because the estate's interest in the ring as of the day the Debtor filed for bankruptcy was limited by the condition that either the Debtor or Sutcliffe could cause full ownership of the ring to revert to Sutcliffe by calling off the marriage, the Court concludes the estate's interest was worth nothing on that day. Even if the estate's interest had some value, the value was certainly less than the Debtor's $1,000 exemption for jewelry under K.S.A. 60–2304(b). In light of this ruling, the value of the ring itself is not relevant to the other questions to be resolved in this case, so the Court will not decide how much the ring is worth.

*2. The Debtor Lacks Sufficient Regular Income to Make Plan Payments, So She Is Not Eligible to Be a Chapter 13 Debtor, and Her Plan Is Not Feasible and Cannot Be Confirmed.*

The Bank argues that the Debtor does not have sufficient "regular income," as defined in § 101(30) of the Bankruptcy Code, to be eligible under § 109(e) to be a debtor under Chapter 13, and that her plan is not feasible, as required by § 1325(a)(6) for the plan to be confirmed. After considering the circumstances of this case, the Court agrees with the Bank on these points.

■ Section 109(e) provides that only "an individual with regular income" and

debts within certain limits is eligible to be a debtor under Chapter 13. The quoted phrase is defined by § 101(30) to mean an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13." When the Debtor filed her Chapter 7 petition in April 2003, she had just shut down her corporate interior design retail store, but was trying to earn some income by continuing to do interior design work from her home. At that time, she projected that she would make $3,000 per month from her business, and reported she had monthly expenses of almost $3,200. Two years later, when her bankruptcy case was converted to Chapter 13, she reported that she paid monthly expenses of about $1,200 and could pay $100 per month into a plan. Four months after that, in August 2005, she reported she was making about $1,400 per month from her business and paying $1,300 in expenses. Since April 2003, the Debtor has reported that Sutcliffe is paying for her housing, food, and utilities. Nothing was presented to the Court to indicate that Sutcliffe has promised to continue providing such support, and only minimal circumstantial evidence indicated he has income or other resources that assure he will remain able to provide it.

At a hearing in September 2005, the Court advised the Debtor it believed she was capable of obtaining employment making more money than her interior design work was producing, and so could pay more into her Chapter 13 plan. When the Debtor last amended her plan in February 2006, she indicated she was actively seeking employment and would amend her schedules of income and expenses when she got a new job. She did not amend her income and expense schedules before the trial in July 2006, and the last ones she

submitted showed that she had only $200 per month available to devote to plan payments after paying only that portion of her living expenses that Sutcliffe does not pay for her. Other than the implication that Sutcliffe might be giving her an extra $200 per month, she has presented nothing to indicate how she will be able to increase her payments to the $400 she proposed in her last amended plan. At trial, the only specific job the Debtor mentioned having applied for was as a substitute teacher for the Lawrence public schools, a position for which she would be interviewing in about ten days, and that she expected might give her work about one day per week. Nothing presented to the Court suggests that the Debtor has made a concerted effort to look for a full-time job.

These circumstances make clear that the Debtor could not make plan payments without Sutcliffe's contribution of housing, food, and utilities, and perhaps half of the plan payments themselves. As the Bank points out, since the Debtor and Sutcliffe are not married, he has no legal obligation to pay any of her expenses. A leading commentator on Chapter 13, Bankruptcy Judge Keith M. Lundin, reports in his treatise that courts have generally been somewhat willing to consider gratuitous contributions from the non-bankruptcy-filing spouse of a debtor to be "regular income" for purposes of Chapter 13 eligibility, more reluctant when the contributions are from other family members or relatives, and willing to accept them from someone like a boyfriend only when he makes a formal promise to help fund the plan and testifies about his ability to do so.[32] Under circumstances similar to this case, at least two courts have held the debtor did not have sufficient "regular income" to be eligible to be a Chapter 13

32. 1 Lundin, *Chapter 13 Bankruptcy*, 3d ed., § 9.10 at 9–18 to –25 (2000 & Supp.2004).

debtor.[33] The Court has allowed the Debtor nearly a year to find full-time work so she would have sufficient income to fund a plan, but she has failed to do so. The Court concludes the Debtor does not have "sufficiently stable and regular" income to be able to fund a plan and is therefore not eligible to be a Chapter 13 debtor.

■ Even if the Debtor's income satisfied § 109(e)'s criteria for her to be eligible to be a Chapter 13 debtor, in order to confirm her plan, the Court would have to be convinced "the debtor will be able to make all payments under the plan and to comply with the plan." [34] As Judge Lundin explains, this feasibility requirement is complemented by the "stable and regular" income requirement for Chapter 13 eligibility.[35] Similar to the Debtor's eligibility problem, without evidence of Sutcliffe's ability and obligation to continue to provide the Debtor with housing, food, utilities, and perhaps a portion of her plan payments, the Court cannot conclude that she will be able to make all the payments proposed for the duration of her plan. Consequently, the Debtor has failed to prove that her plan is feasible, and it cannot be confirmed.

Although the Bank also argues that the Debtor's lack of good faith in proposing her plan, a circumstance that would violate § 1325(a)(3), precludes confirmation, the Court declines to address that question now. The Court's conclusions that the Debtor is not eligible for Chapter 13 relief due to a lack of sufficiently stable and regular income and that her plan is not feasible make the good faith question moot.

*3. Cause Exists to Convert or Dismiss this Case, So the Bank's Request to Re–Convert the Case to Chapter 7 Will Be Granted.*

■ Section 1307(c) provides that the Court may convert or dismiss this case "for cause," including "(1) unreasonable delay by the debtor that is prejudicial to creditors," and "(5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan." The Court has given the Debtor plenty of time to increase her income by finding a new job or substantially improving her interior design business, but she has failed to show that she is willing or able to do either. Delaying this case any further by giving her more time to improve her financial condition would be unreasonable. In addition, the Court has now denied confirmation of her third attempt to propose an acceptable plan, and would deny any request she might make for more time to amend her plan again. The Bank has asked for the case to be converted back to Chapter 7, and other than trying to get a Chapter 13 plan confirmed, the Debtor has not opposed that request. Of course, the main reason the Bank wanted the case to return to Chapter 7 was so a trustee could liquidate the engagement ring and distribute the proceeds to creditors. However, while the

---

**33.** *See In re Jordan,* 226 B.R. 117, 119–20 (Bankr.D.Mont.1998) (rejecting debtor's assertion live-in boyfriend's income could be counted as part of her "stable and regular" income; no evidence presented showing boyfriend promised to continue to supply money or had ability to do so); *In re Fischel,* 103 B.R. 44, 48–49 (Bankr.N.D.N.Y.1989) (rejecting trustee's assertion live-in boyfriend's income could be counted as part of debtor's "stable and regular" income, because boyfriend failed to file his own bankruptcy case or otherwise legally obligate himself to provide money to debtor).

**34.** § 1325(a)(6).

**35.** 3 Lundin, *Chapter 13 Bankruptcy, 3d Ed.,* § 198.1 at 198–1 (2000 and Supp.2004).

case was originally in Chapter 7, the trustee did recover some money which must still be distributed. Under the circumstances, the Court concludes the case should be re-converted to Chapter 7.

## CONCLUSION

For these reasons, the Court concludes: (1) the engagement ring that Sutcliffe gave the Debtor is not property of her bankruptcy estate, and filing for bankruptcy did not terminate the Debtor's power to call off the engagement; (2) before the Debtor ended the engagement, the estate's conditional interest in the ring was worth less than the amount the Debtor claimed as exempt; (3) the Debtor's Chapter 13 plan cannot be confirmed because (a) she has insufficient regular income of her own to be eligible to be a Chapter 13 debtor, and (b) the insufficiency of her income also prevents the Court from finding her proposed plan to be feasible; and (4) this case must be re-converted to Chapter 7.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by FRBP 9021 and FRCP 58.