## Smith v. Liberty Mutual Fire Insurance Co.

*Joseph A. Zenstein,* for plaintiff.
*William C. Foster,* for defendant.

LEVIN, *S.J.,* September 27, 2002—

## INTRODUCTION

The sole issue presented by this case is whether the failure of the recipient of an engagement ring to return it upon termination of the engagement constitutes a "theft" so as to entitle the donor to recover the value of the ring from his homeowners' insurance carrier.

I conducted a non-jury trial in this matter on June 17, 2002, and after all evidence had been presented, I made factual findings on the record and requested briefs from both parties on the narrow legal issue raised. After receiving and considering the briefs, I found for the defendant on August 19, 2002; my finding was docketed and mailed to counsel the following day.

Though I did not expressly say so when I directed counsel to file post-hearing briefs, I selected that procedure—at least in part—to obviate the post-trial motion phase of this matter, as I planned to render a final decision that there would be no reason to revisit.

Indeed, neither party filed a post-trial motion, and the plaintiff filed a timely notice of appeal on August 30, 2002. Under the procedure I selected, however, the plaintiff did *not* waive his right to appellate review of the sole legal issue at hand, and I would thus request that the Superior Court consider this appeal on the merits even in the absence of post-trial proceedings.

## BACKGROUND

In January 2000, the plaintiff, who had posted personal information about himself on an internet website called "match.com" received correspondence by e-mail

from a woman in Australia, who identified herself to the plaintiff as Ms. Bergittia von Buelow de Rothschild.

The plaintiff and Ms. Rothschild corresponded back and forth, on a daily basis, for several weeks, and in late January, Ms. Rothschild flew to Philadelphia to meet the plaintiff. She stayed in Philadelphia for nine or 10 days, and at the end of her visit, on February 6, 2000, the plaintiff presented her with a $12,475 engagement ring. Ms. Rothschild then returned to Australia, ostensibly (according to the plaintiff, who claimed that the ring was *not* given as a gift) to see if she could acquire a similar ring there at a lesser price.

Shortly after Ms. Rothschild departed, the plaintiff received information from several investigators that he had hired, which indicated that Ms. Rothschild was not what she had seemed to be.

The plaintiff then confronted Ms. Rothschild by telephone, and called her—among other things—a "hooker" and a "con artist." Soon thereafter, Ms. Rothschild's home and cellular telephone numbers were disconnected, her e-mail address stopped accepting incoming messages, and the plaintiff lost contact with her.

On July 18, 2000, the plaintiff reported the loss of the ring to the Cheltenham Township police, and on July 20, 2000, he filed a sworn proof of loss with his homeowners' insurance carrier, Liberty Mutual Fire Insurance Company, on the basis that the ring had been stolen.

Liberty Mutual denied the claim on September 23, 2000.

On February 2, 2001, the plaintiff filed this suit against Liberty Mutual, alleging breach of the insurance contract, and bad faith denial of the claim.

## DISCUSSION

At the conclusion of trial, I made several factual findings on the record, as set forth below:

(1) The plaintiff was conned [by Ms. Rothschild] into entering into an engagement;

(2) The plaintiff did, in fact, enter into an engagement with Ms. Rothschild;

(3) The ring was purchased for an engagement, and was intended to serve as an engagement ring;

(4) The plaintiff gave the ring to Ms. Rothschild as an engagement present, upon the expectation of marrying her;

(5) The plaintiff considered himself engaged to Ms. Rothschild when she left Philadelphia to return to Australia;

(6) The plaintiff's testimony that he gave Ms. Rothschild the ring so that she could take it to Australia to compare prices there was not credible; and

(7) The value of the ring was the price that the plaintiff paid for it, or $12,475.[1] N.T., June 17, 2002, pp. 63-66.

The plaintiff's claim under the insurance policy, a copy of which was admitted to evidence as exhibit "P-1," was premised upon the following provision:

"Section I—Perils Insured Against . . .

"Coverage C—Personal Property

"We insure for direct physical loss to the property described in coverage C caused by a peril listed below unless the loss is excluded in Section I—Exclusions. . . .

---

1. I misstated this amount in the record as $12,450.

"(9) Theft, including attempted theft and loss of property from a known place when it is likely that the property has been stolen."

The term "theft" is not defined in the policy, but the following definition appears in the Merriam-Webster Collegiate Dictionary, 10th Edition (1998):

"Theft: (noun):

"1.a: the act of stealing; *specifically:* the felonious taking and removing of personal property with intent to deprive the rightful owner of it

"b: an unlawful taking (as by embezzlement or burglary) of property."

Black's Law Dictionary, 7th Edition (1999), defines theft as:

"(1) The felonious taking and removing of another's personal property with the intent of depriving the true owner of it; larceny.

"(2) Broadly, any act or instance of stealing, including larceny, burglary, embezzlement, and false pretenses."

Certainly, given the factual findings that I made in this case, Ms. Rothschild did not "take" the ring, either feloniously, or otherwise; it was given to her by the plaintiff, willingly, as an engagement present.

The question then becomes whether Ms. Rothschild's failure to return the ring, upon termination of the engagement, transforms the voluntary gift into the object of a theft, or whether the circumstances under which she obtained the ring in the first place constituted a theft by deception—though the plaintiff did not argue the latter proposition.

Though it is true that our Supreme Court, as recently as November 1999, held that an engagement ring is a

conditional gift, subject to the condition that the recipient marry the giver, *Lindh v. Surman,* 560 Pa. 1, 742 A.2d 643 (1999), and returnable upon termination of the engagement, it is difficult to imagine that the court intended that failure to return the ring under such circumstances would constitute a criminal offense.

In fact, as defense counsel noted in his brief, the court chose to adopt a "no-fault" approach to "ring return" precisely because of the unpleasantness that it feared would ensue under a fault-based system:

"The rule concerning the return of a ring founded on fault principles has superficial appeal because, in the most outrageous instances of unfair behavior, it appeals to our sense of equity. Where one fiancée has truly 'wronged' the other, depending on whether that person was the donor of the ring or the donee, justice appears to dictate that the wronged individual should be allowed to keep, or have the ring returned. However, the process of determining who is 'wrong' and who is 'right,' when most modern relationships are complex circumstances, makes the fault-based approach less desirable. A thorough fault-based inquiry would not[2] end with the question of who terminated the engagement, but would also examine that person's reasons. In some instances the person who terminated the engagement may have been entirely justified in his or her actions. This kind of inquiry would invite the parties to stage the most bitter and unpleasant accusations against those whom they nearly made their spouse, and a court would have no clear guidance with regard to how to ascertain who was 'at fault.' The Su-

---

2. Rendered as "would not only end" in published opinion. Apparently an error.

preme Court of Kansas recited the difficulties with the fault-based system:

"What is fault or the unjustifiable calling off of an engagement? By way of illustration, should courts be asked to determine which of the following grounds for breaking an engagement is fault or justified? (1) The parties have nothing in common; (2) one party cannot stand prospective in-laws; (3) a minor child of one of the parties is hostile to and will not accept the other party; (4) an adult child of one of the parties will not accept the other party; (5) the parties' pets do not get along; (6) a party was too hasty in proposing or accepting the proposal; (7) the engagement was a rebound situation which is now regretted; (8) one party has untidy habits that irritate the other; or (9) the parties have religious differences. The list could be endless. *Heiman v. Parrish,* 262 Kan. 926, 942 P.2d 631, 637 (1997).

"A ring-return rule based on fault principles will inevitably invite acrimony and encourage parties to portray their ex-fiancées in the worst possible light, hoping to drag out the most favorable arguments to justify, or to attack, the termination of an engagement. Furthermore, it is unlikely that trial courts would be presented with situations where fault was clear and easily ascertained and, as noted earlier, determining what constitutes fault would result in a rule that would defy universal application." *Id.* at 6, 742 A.2d at 645-46.

As defense counsel correctly observes, the *Lindh* ruling appears to have been formulated with basic principles of contract law in mind. Certainly, breach of a contract— even if that contract requires the return of goods upon demand and the breaching party fails to do so—does not

automatically constitute a crime, nor—I think—should failure to return an engagement ring rise to the level of a criminal offense.

Finally, based upon the evidence presented at trial, it seems clear that Ms. Rothschild's conduct does not constitute the criminal offense of theft by deception, defined as "intentionally obtain[ing] or withhold[ing] property of another by deception." 18 Pa.C.S. §3922.

There is nothing in the record to suggest that Ms. Rothschild *asked* the plaintiff to buy her a ring, or that she otherwise directly induced the plaintiff to purchase a ring and give it to her. The plaintiff chose to do so of his own free will, and, in fact, considered himself engaged until after Ms. Rothschild had already returned to Australia. Because Ms. Rothschild did not *obtain* or *withhold* the ring by false pretenses, the offense of theft by deception is inapplicable to this case.[3]

## CONCLUSION

Because Ms. Rothschild neither "took and removed" the ring nor obtained it under false pretenses, the loss does not fall within the "theft" provision of the plaintiff's insurance policy.

Further, because I do not believe that the failure to return an engagement ring following termination of the engagement constitutes a criminal offense, the plaintiff cannot recover under the policy by so characterizing Ms. Rothschild's behavior.

3. I am simply unwilling to find, on the record presented, that Ms. Rothschild's *sole* purpose in establishing a relationship with the plaintiff was to obtain valuable property from him under false pretenses. Had that been shown, the applicability of the theft by deception statute might have been a closer call.

Though I am not without sympathy for the plaintiff, who was surely left quite disillusioned by this entire affair, I simply do not see any basis upon which the plaintiff is entitled to recover for this loss from his insurance carrier.

Accordingly, my finding in favor of the defendant, Liberty Mutual, should be affirmed.