# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

JON D. WALTON, )
                )
     Plaintiff, )
                )
     v. )     C.A. No.: CPU4-13-000791
                )
JENNIFER D. SNOW, )
                )
     Defendant. )
                )

Submitted: January 28, 2014
Decided: February 28, 2014
Revised: March 3, 2014

Richard L. Abbott, Esquire          Jennifer Snow
Abbott Law Firm                   377 Lynetree Drive
724 Yorklyn Road, Suite 240        West Chester, PA 19380
Hockessin, DE 19707            *Self-represented Defendant*
*Attorney for Plaintiff*

## DECISION AFTER TRIAL

**RENNIE, J.**

Plaintiff Jon D. Walton ("Walton") brought this action to recover the value of an engagement ring given to Jennifer D. Snow ("Snow") when the couple was engaged to be married. Trial took place on January 28, 2014. The Court heard testimony from three witnesses,[1] and documentary evidence was submitted by both parties.[2] At the conclusion of trial, the Court reserved decision. This is the Court's Final Decision After Trial.

## PROCEDURAL HISTORY

On March 7, 2013, Walton filed this conversion action against Snow, seeking $27,000.00 as the fair market value for the engagement ring he gave to Snow. On May 16, 2013, Snow filed an answer and counterclaim, seeking to recover monetary damages and replevin for a number of alleged offenses.[3]

Trial was held on January 28, 2014. In opening argument, counsel for Walton stated that Walton sought the value of the ring because the ring was not available.[4] Counsel stated that Snow is a resident of Pennsylvania, which caused Walton concerns about pursuing a replevin action. During trial, Snow proceeded on her counterclaim only as to: damages for the repair of her bed; damages for unpaid rent; recovery of diamond earrings; and damages for interest and penalties incurred in liquidating her 401k.

---

[1] Jon Walton was the sole witness to testify during Plaintiff's case-in-chief. Two witnesses testified during Defendant's case-in-chief: Jennifer Snow and Joseph Clyde Louth.

[2] Plaintiff's Exhibits 1 through 16 were admitted into evidence. Defendant's Exhibits 1 through 4 were also admitted into evidence.

[3] Specifically, Snow sought to recover for: (1) destroyed bed and rugs in the amount of $875.00; (2) loss of 401k in the amount of $11,250.00; (3) taxes and penalties related to withdrawal of 401k in the amount of $1,125.00; (4) Lost appreciation from withdrawal of 401k in the amount of $900.00; (5) rent in the amount of $500.00; (6) moving expenses in the amount of $430.00; (7) ring given to Walton in the amount of $7,000.00; and, (8) home decorating at a rate of $50 per hour, for a total of $12,000.00.

[4] At trial, Snow confirmed that she was still in possession of the ring and stated that she indicated the same to counsel for Walton in response to Walton's discovery request.

It is Walton's position that, although he called off the wedding, Snow is responsible for the ending of the engagement. Walton contends that, at the very least, the engagement was ended due to mutual cause and, as such, he should be awarded the fair market value of the engagement ring under his conversion claim. Walton relies on two decisions of this Court in support of his position that, where the engagement is mutually ended, the ring must be returned to the donee.[5] It is Snow's position that she did not end the engagement and she did not cause the engagement to end.

## FACTS

Walton and Snow met on eHarmony.com in 2011. Walton testified that the couple dated until early 2012 when "some confrontational situations" caused the relationship to end. However, the couple reconciled and resumed the relationship until May 2012, when the couple again parted ways (the "May Breakup").

Walton attributed the May Breakup to Snow's disposition. He testified to specific instances where Snow exhibited unfavorable behavior. In one example, the couple was in New York City and Walton decided to purchase a new bed for his daughter who lived in the city. Snow referred to the gift as "exorbitant" (the "Mattress Incident"). The second occurrence took place the same weekend, when Walton presented Snow with a croissant. Walton testified that Snow "freaked out" and became angry because of her weight concerns (the "Croissant Incident"). Snow testified that, at the time, she was following a gluten-free diet, and was thus upset by Walton's insensitivity in presenting her with a wheat-based pastry.

---

[5] At trial, Walton referred to *Machurek v. Wilson*, 2007 WL 2318637 (Del. Com. Pl. Aug. 14, 2007) and *Byam v. Jackson*, 2011 WL 3035273, at *2 (Del. Com. Pl. June 22, 2011), in support of his argument.

3

Following the May Breakup, the couple remained uncoupled for a few months. During the break, Snow informed Walton that she had rejoined the church, she was going to the gym daily, and she was even reading a book written by Deepak Chopra. Walton testified that Snow was "regaining control of herself." Sometime during the summer of 2012, Snow, who had just started a new job, called Walton, a financial advisor, for guidance on her 401k. Soon thereafter, the two met for coffee, and enjoyed a nice evening together.

After the successful coffee date, Walton took time off from work to visit Snow while she was working in the Washington D.C. area. Walton testified that he spent a few days with Snow and had a "nice time."

In August 2012, Walton had to travel to New York City for work, and he invited Snow to visit him. She obliged. On August 12, 2012, Walton and Snow, accompanied by Walton's dog, went on a rowboat excursion on the Hudson River. Walton testified that Snow looked "angelic" and "happy." Walton testified that he told Snow that they should get married, and the couple agreed to do so.

Walton turned to his childhood friend and Ohio-based jeweler, Jim Jensen ("Jensen"), to purchase the engagement rings.[6] The couple decided that they would design the rings themselves, and they elected to depart from traditional styles by using black diamonds. Walton told Jim he wanted a two-karat black diamond for Snow's ring. In September, Jensen notified Walton that he found a black diamond which matched Walton's criteria. Jensen sold Walton the diamond at the wholesale price of $15,000.00. The ring in its entirety bore a price tag of $19,800.[7] At some point, Jensen sent the ring to Snow to try on, but the ring did not fit. The

[6] Walton testified that he is from Ohio and that he purchased his first wife's ring from Jensen.
[7] Walton paid for the ring in two installments. The first payment was made on September 24, 2012, in the amount of $15,000.00. The second payment was made on December 24, 2012, in

4

couple decided that they would take the ring to Jensen in Ohio for resizing, at which point Snow could also meet Walton's father.

On direct examination, Walton testified that the couple had dual residence. Snow stayed with Walton most of the time (the "Delaware Home"), but she remained a resident of Pennsylvania, and still had an apartment in Wayne, Pennsylvania.

In the meantime, according to Walton, Snow's "commitment to renewal" began to unravel. Walton testified that there were instances that made him "take great pause" in whether they should marry. According to Walton, on one occasion, he made dinner for Snow, but Snow "lost it" because the meal was prepared with frozen eggplant instead of fresh eggplant (the "Eggplant Incident"). Snow testified that she and Walton had been following a strict diet program, and she was upset by Walton's neglect to equally contribute to the dietary efforts.

In December, while en route to Ohio to pick up Snow's engagement ring, the couple had a "confrontation." Neither party testified as to the nature of this confrontation, however, Walton testified that the matter was resolved and the pair had a "good time" in Ohio. Walton testified that another concerning incident took place on the trip home from Ohio when they picked up Snow's sister-in-law. According to Walton, Snow offered her sister-in-law marital advice that, in Walton's opinion was startling. Walton, who was in the back seat of the car during this conversation, testified that he saw a lot of correlation between Snow's advice and his own situation, which made him "fearful". Nevertheless, when the couple returned home they exchanged rings.

Walton testified that another altercation occurred at Christmastime (the "Christmas Eve Incident"). Walton's adult son decided that he did not want to give Snow a present, which was

---

the amount of $4,900.00 The second payment included an additional charge of $4,900.00 for what appears to be a shipping fee.

5

upsetting to both Walton and Snow. Walton's adult daughter supported the no-present position of her brother. Walton and Snow went to dinner with Walton's son and daughter. During the dinner, a distraught Snow left the table and only returned after being coaxed back inside by Walton.

Finally, on Christmas day, Snow's family planned to come to the Delaware Home. However, according to Walton, Snow got into a "screaming match" on the telephone with a person not identified. The argument related to a custody dispute involving Snow's grandson. After the argument, Snow criticized Walton and his children (the "Christmas Incident"). Walton said the Snow family was still allowed to visit, however, he announced that he would spend the day outside chopping wood because he felt the situation was "such a mess."

Walton testified that after the Christmas Incident, he began to think about the future of the relationship. Between Christmas and New Years Day, Walton decided that he did not want to continue the relationship. However, Snow offered uncontroverted testimony that Walton expressed his love for her when they celebrated the New Year. There were no "episodes" subsequent to that time. Without any indication to Snow, on January 5, 2013, Walton called off the engagement. Walton notified Snow of the breakup via letter. Walton testified that Snow, who at this point was working out of the Delaware Home, asked for latitude; Walton said he would think about it. Unbeknownst to Snow, Walton contacted the New Castle County police. On January 9, 2013, Walton and an accompanying police officer removed Snow from the Delaware Home. There were subsequent communications between the parties concerning the retrieval of Snow's property from the Delaware Home; however, no agreement was reached.

Walton offered to pay for numerous expenses in exchange for the return of the engagement ring; however, no settlement came to fruition and Snow kept the ring. Ultimately,

Walton hired a moving company to deliver Snow's belongings to her new address. After the move, Snow informed Walton that her diamond earrings were not amongst the delivered belongings. Walton responded that he did not recall ever seeing the diamond earrings at the Delaware Home.

On direct examination, Walton testified that after he sent the breakup letter, Snow felt the couple could still "work it out." Indeed, Snow testified that the incidences identified by Walton were not detrimental. Snow testified that she was totally surprised by the breakup, especially because Walton had expressed his love for her when they celebrated the New Year, only a few days prior.[8]

## DISCUSSION

The Court is called upon to determine who is, in fact, the lord of the ring. The issue before the Court is whether Walton proved, by a preponderance of the evidence, that he is entitled to recover $27,000.00 from Snow, as the proposed value of the engagement ring.

### A. The Rules of Engagement

This is not the first instance that a Delaware court has been called upon to determine ownership of an engagement ring when the engagement does not culminate in a marriage.[9] This Court has adopted the majority view that, where the decision to end an engagement is mutual, the ring belongs to the donor:

> [T]he donor of the ring is entitled to its return where the engagement is mutually broken. The rationale for this rule is that an engagement ring is a gift conditional

---

[8] Snow implicated infidelity in her opening statement. During direct examination, Walton testified that in late January 2013 he began dating a woman he had met the previous May, when he and Snow were broken up.

[9] *See Machurek v. Wilson*, 2007 WL 2318637, at *1 (Del. Com. Pl. Aug. 14, 2007); *Byam v. Jackson*, 2011 WL 3035273, at *2 (Del. Com. Pl. June 22, 2011).

on the subsequent marriage of the parties, and when the condition is not fulfilled, the donee no longer has any right to the ring.[10]

While ownership of a ring in the mutual dissolution of an engagement is easily ascertainable, problems arise when the breakup is unilateral. The present issue is one of first impression in Delaware: when the decision to end an engagement is not mutual, who is entitled to the engagement ring? In the absence of Delaware case law on point, the Court will first examine the prevailing views in other jurisdictions.

### a. The Engagement Ring is a Conditional Gift

The parties do not dispute that the engagement ring was given to Snow in contemplation of marriage. Delaware, like most jurisdictions, allows a donor to recover a gift of personal property where "the gift is of such symbolic significance or value that the law will imply that it was given in contemplation of marriage."[11] Generally, where an engagement ring is given in contemplation of marriage and, by mutual accord that condition (marriage) is not met, the donor is entitled to the ring.[12] However, there is a split of authority regarding rightful ownership of an engagement ring when the condition of marriage does not occur by fault of the donor.

Traditionally, the majority of jurisdictions followed a fault rule, denying return of the ring to a donor who caused the end of the engagement.[13] Some jurisdictions now follow the no-fault approach, which calls for the return of the engagement ring to the donor without

---

[10] *Machurek*, 2007 WL 2318637, at *1 (quoting *Spinnell v. Quigley*, 785 P.2d 1149 (Wash. Ct. App. 1990)).

[11] *Elliott v. Hunter*, 1967 WL 90379, at *1 (Del. Super. June 19, 1967) (citing *Gilkos v. Nicholis*, 96 N.D. 177, 71 A.2d 785 (N.H. 1950); *See also Beck v. Cohen*, 237 App. Div. 729, 262 N.Y.S. 716 (App. Div. 1933); *Albanese v. Indelicato*, 25 N.J. Misc. 144, 51 A.2d 110 (D. Jersey City 1947);

[12] *See Machurek*, 2007 WL 2318637, at *1; *Spinnell*, 785 P.2d 1149; *Vann v. Vehrs*, 633 N.E.2d 102 (Ill. App. Ct. 1994).

[13] *See Spinnell*, 785 P.2d at 1150 ("The majority of jurisdictions refuse to enforce the condition if the donor unjustifiably terminates the engagement").

8

consideration as to the cause of the breakup.[14] Each approach presents unique problems in their application.

### b. Fault v. No-Fault

In the no-fault line of cases, where the condition of marriage is not fulfilled, the ring is returned to the donor without regard for fault.[15] Under the no-fault approach, fault is considered irrelevant because the condition precedent of marriage failed.[16] "A no-fault approach . . . involves no investigation into the motives or reasons for the cessation of the engagement and requires the return of the engagement ring simply upon the nonoccurrence of the marriage."[17] Thus, determination of whether the breakup was mutual plays no role in a no-fault analysis, as mutuality of the split is irrelevant.

The no-fault rule is not without disadvantages. Such a harsh rule can engender an inequitable result. For example, the no-fault approach would result in the return of the ring to the donor in situations such as: where the donor participates in open, notorious adultery; where the donor

---

[14] *See Fierro v. Hoel*, 465 N.W.2d 669, 671 (Iowa Ct. App. 1990); *Meyer v. Mitnick*, 625 N.W.2d 136, 139 (Mich. Ct. App. 2001); *Heiman v. Parrish*, 942 P.2d 631, 635 (Kan. 1997).

[15] *See Aronow v. Silver*, 538 A.2d 851, 854 (N.J. Super. Ct. Ch. Div. 1987) ("When the promise of marriage was not kept, regardless of fault, the condition was not fulfilled and the ring must be returned to [the donor]"); *Fierro v. Hoel*, 465 N.W.2d at 672 ("In summary, we hold an engagement ring given in contemplation of marriage is an impliedly conditional gift; it is a completed gift only upon marriage. If the wedding is called off, for whatever reason, the gift is not capable of becoming a completed gift and must be returned to the donor"); *Miller v. Chiaia*, 2011 WL 1367050 (Conn. Super. Ct. Mar. 15, 2011) ("[T]here are more recent cases which are stated to comprise a modern trend and which, because of what they deem to be the "inherently conditional" nature of an engagement ring, have adopted a "no-fault" approach. This line of authority would resolve the issue of the ring's ownership in favor of the donor, regardless of who caused the engagement to be broken or who was at fault").

[16] *See Vigil v. Haber*, 888 P.2d 455, 457 (N.M. 1994); *Fowler v. Perry*, 830 N.E.2d 97, 105 (Ind. Ct. App. 2005); *Thorndike v. Demirs*, 2007 WL 2363411, at *11 (Conn. Super. Ct. July 26, 2007).

[17] *Lindh v. Surman*, 742 A.2d 643, 645 (Pa. 1999).

inflicts physical abuse on the donee; where the donor leaves the donee at the altar amongst countless onlookers.

On the other end of the spectrum is the fault rule. Jurisdictions that adhere to the fault rule are tasked with determining which party is responsible for the termination of the engagement. "Under a fault-based analysis, return of the ring depends on an assessment of who broke the engagement, which necessarily entails a determination of why that person broke the engagement."[18]

In *Spinnell v. Quigley*, the Court of Appeals of Washington explained that the fault rule is premised on a contract theory, with the engagement ring symbolizing an agreement to wed.[19] If, due to a breach by the donor, the agreement is not fulfilled, "the donor should not benefit from that breach by regaining the ring."[20] The *Spinnell* court went on to explain:

> On principle, an engagement ring is given, not alone as a symbol of the status of the two persons as engaged, the one to the other, but as a symbol or token of their pledge and agreement to marry. As such pledge or gift, the condition is implied that if both parties abandon the projected marriage, the sole cause of the gift, it should be returned. Similarly, if the woman, who has received the ring in token of her promise, unjustifiably breaks her promise, it should be returned.

> When the converse situation occurs, and the giver of the ring, betokening his promise, violates his word, it would seem that a similar result should follow, i.e., he should lose, not gain, rights to the ring . . . "[n]o man should take advantage of his own wrong."[21]

On the one hand, the fault rule adheres to notions of fairness and equity by refusing to benefit the "breaching" party who causes the non-occurrence of the marriage. On the other hand,

---

[18] *Id.*
[19] 785 P.2d at 1150.
[20] *Id.*
[21] *Id.*

the fault rule requires the Court to undertake the task of determining which party is to blame for the demise of the relationship. Furthermore, what does or does not constitute justification for a breakup can be wholly subjective, and requires a deep understanding of the complexities of the relationship.

The fault approach does, however, find support in the *Restatement of Restitution*, § 58(c).[22] In Delaware, the Superior Court turned to the *Restatement of Restitution*, § 58(c), to determine whether a donor could recover a gift of personal property.[23] In *Elliott v. Hunter*, the plaintiff sought to recover a dog given to his fiancé shortly after the couple became engaged.[24] The court recognized that a gift of personal property may be recovered by the donor where the gift was given in contemplation of marriage.[25] The court relied on the *Restatement of Restitution*, § 58(c), in reaching its decision denying plaintiff's motion for summary judgment on the grounds that the dog was not a gift given in contemplation of marriage and, therefore, was not recoverable when the engagement was broken.

The *Restatement of Restitution*, § 58(c), permits a donee to retain the gift if the marriage does not come to fruition, so long as the donee is not at fault:

> Gifts made in the hope that a marriage or contract of marriage will result are not recoverable, in the absence of fraud. Gifts made in anticipation of marriage are not ordinarily expressed to be conditional and, although there is an engagement to marry, *if the marriage fails to occur without the fault of the donee, normally the gift cannot be recovered.* If, however, the donee obtained the gift fraudulently or if the gift was made for a purpose which could be achieved only by the marriage, a donor who is not himself at fault is entitled to restitution if the marriage does not take place, even if the gift was of money . . . If there is an engagement to marry and the donee, having received the gift

---

[22] *See, e.g., id.*

[23] *Elliott, supra* note 11, at *1.

[24] *Id.* at *1.

[25] *Id.* ("Many courts which have dealt with this problem have held that, in the absence of fraud, a gift of personal property is recoverable by the donor when there is an express agreement that the gift is conditional or when the gift is of such symbolic significance or value that the law will imply that it was given in contemplation of marriage.")

11

without fraud, later wrongfully breaks the promise of marriage, the donor is entitled to restitution if the gift is an engagement ring, a family heirloom or other similar thing intimately connected with the marriage . . .[26]

Despite the flaws of the fault system, this Court is apt to follow the standard set forth in the *Restatement of* Restitution, § 58(c), previously adopted by the *Elliott* court, in determining the recoverability of a gift implicitly conditioned on marriage. Moreover, Delaware has impliedly adopted the fault rule in cases addressing the ownership of a ring following the termination of the relationship. In *Machurek v. Wilson*[27] and *Byam v. Jackson*,[28] this court relied upon the principal that, where an engagement is mutually broken, the donor is entitled to the return of the ring.[29]

In *Machurek*, the court found that "the engagement was mutually broken by the parties. Neither the plaintiff nor the defendant presented factual testimony at trial that it was unilaterally broken." Likewise, in *Byam*, the court determined that the engagement was mutually broken, as there was "no overwhelming evidence that either side was so manifestly at fault as to find that there was anything but a mutual dissolution of the relationship." Any consideration of the underlying circumstances surrounding the termination of the engagement necessarily requires a consideration of fault, thereby precluding the no-fault rule which requires a return of the ring to the donee under all circumstances.

Accordingly, the Court finds the *Restatement of Restitution*, § 58(c), applicable, and a determination of fault is warranted.

---

[26] *Restatement of Restitution*, § 58 (c) (emphasis added).
[27] *Machurek, supra* note 4, at *1.
[28] *Byam, supra* note 4, at *2.
[29] *Machurek*, 2007 WL 2318637, at *1.

12

## c. *Determination of Fault*

Walton contends that Snow, by her behavior, caused the engagement to end. In support of his position, Walton testified to six occasions where Snow behaved in a way that caused Walton to reconsider his decision to marry: the Mattress Incident; the Croissant Incident; the Eggplant Incident; the Ohio Incident; the Christmas Eve Incident, and; the Christmas Incident.

The Court does not find this testimony to be credible.[30] Of the six episodes discussed by Walton, two of them–the mattress Incident and the Croissant Incident–took place before the May Breakup, and well before Walton proposed marriage. In fact, four of the six episodes occurred before the couple exchanged rings in December 2012.[31] To the extent that Snow did in fact exhibit erratic and undesirable qualities–a conclusion that the Court is not reaching–Walton was well aware of these issues prior to furnishing the ring, and proceeded nonetheless.

Armed with the knowledge and information of Snow's behavioral history, while on the Hudson River Walton made the conscious decision to propose. Snow's propensity to behave in a manner unsavory to Walton was affirmed in the interim between the proposal and Walton's acquisition of the ring, yet Walton made the conscious decision to render Snow the ring. None of the testimony presented suggests that Snow's behavior was unexpected or at any point deviated from her norm. Accordingly, the Court finds that Walton's argument that Snow is at fault for the end of the engagement is without merit.

---

[30] Walton's testimony included a number of inconsistencies in his portrayal of the relationship. On direct examination, Walton's testimony indicated that he considered Snow to be a resident of the Delaware Home. When testifying about the Eggplant Incident, Walton stated "when she [Snow] got home." At one point, Walton described Snow as "this person living in my house." However, on cross examination, Walton varied in his characterization of Snow's position in the Delaware Home, stating that he considered her to be a "houseguest."

[31] Only the Christmas Eve Incident and the Christmas Incident took place post-delivery of the ring.

13

Walton's alternative position that the termination of the engagement was ended due to mutual cause is not supported by the evidence presented at trial. It is uncontested that Walton is the party that called off the engagement. Walton himself testified that Snow felt like the couple could work things out if they worked together. Snow likewise testified that she was shocked when Walton broke off the engagement. Clearly the decision to separate was not mutual nor was the cause of the breakup mutual.

As previously discussed, under the fault approach, where the engagement does not take place through no fault of the donee, the donor cannot recover the engagement ring. The Court finds that fault cannot be attributed to Snow for the dissolution of the engagement. Accordingly, Walton does not have a property interest in the engagement ring.

## B. Conversion

During trial Walton articulated on a number of occasions that he unequivocally did not seek recovery of the engagement ring. Instead, Walton made a calculated decision to proceed on a conversion theory. Because Walton had no right to recover the engagement ring following the dissolution of the engagement, he had no property interest in the ring, and his conversion claim fails.[32]

## C. Snow's Counterclaims

At trial, Snow sought to recover damages for the following: (1) bed repair, in the amount of $175; (2) partial rental payment in the amount of $550.00; (3) the return of diamond earrings, or the filing of a claim therefore, and (4) interest and penalties incurred as a result of liquidating

---

[32] *See Arnold v. Society for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996) ("For a plaintiff to recover under a theory of conversion, he must prove, *inter alia,* precisely what property the defendant converted and that his interest in the property was viable at the time of the conversion"); *CIT Communications Finance Corp. v. Level 3 Communications, LLC,* 2008 WL 2586694 (Del. Super. June 6, 2008).

14

her 401k which, she argues, she did upon the "poor advice" of Walton.[33] However, the legal framework for each item of recovery is unclear.

It appeared that Snow sought recovery for the damage to the bed and the partial rental payment on a breach of contract theory. To prevail on a breach of contract claim, Snow must prove, by a preponderance of the evidence, that: (1) a contract existed between the parties; (2) breach by defendant of an obligation imposed by the contract; and (3) as a result of that breach plaintiff suffered damages.[34] Snow failed to establish that a contract existed between the parties. Snow submitted an exchange of text messages between the parties, in which Walton stated that he would pay Snow $550.00 for rent. However, Walton's offer to pay rent was expressly conditioned on Snow returning the ring; a condition which was not met.[35]

As to damages for interest and penalties incurred in the liquidating of her 401k, it appears that Snow sought to recover on a negligence theory. To establish a *prima facie* case for negligence, a plaintiff must prove, by a preponderance of the evidence: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) the defendant's breach proximately caused the plaintiff's harm, and; (4) the plaintiff suffered harm.[36]

Snow argued that Walton offered her advice, in his capacity as a professional financial planner. Snow argued, in essence, that this financial advice fell below the standard of care owed by a professional. Snow failed to present any evidence to establish that Walton served as her

---

[33] In the counterclaim, Snow sought to recover $7,000.00 for the engagement ring she gave to Walton. At trial and on the record prior to a ruling on the merits, Walton, on his own accord, returned the engagement ring to Snow. Snow subsequently abandoned her claim for monetary damages of the ring she had given Walton.

[34] See *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Gregory v. Frazer*, 2010 WL 4262030, *1 (Del. Com. Pl. Oct. 8, 2010).

[35] *Restatement (Second) of Contracts* §30(1) (1981).

[36] *Jones v. Crawford*, 1 A.3d 299, 302 (Del. 2010) (citation omitted).

15

financial advisor or that he rendered any financial advice in his capacity as a professional. Thus, Snow failed to prove, by a preponderance of the evidence, that Walton owed her a duty of care.

Finally, as to the diamond earrings, Snow sought to recover possession of the earrings. The Court will construe this as a replevin action. "Replevin is primarily a form of action for the recovery of the possession of personal property which has been taken or withheld from the owner unlawfully."[37] No evidence was adduced at trial to establish that Walton took or withheld the earrings at any time. In fact, none of the evidence established that the earrings were ever in Walton's possession. Accordingly, Snow cannot prevail on the counterclaim for recovery of her diamond earrings.

## CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendant on Plaintiff's claim for conversion. On Defendant's counterclaims, I find in favor of Plaintiff. Each party shall bear his or her own costs.

**IT IS SO ORDERED this 3ʳᵈ day of March, 2014.**

The Honorable Sheldon K. Rennie,
Judge

---

[37] *Harlan & Hollingsworth Corp. v. McBride*, 69 A.2d 9, 11 (Del. 1949).